(66 App. Div. 423.)

STACKHOUSE v. HOLDEN.

(Supreme Court, Appellate Division, Fourth Department.    November 12, 1901.)

1. BANKRUPTCY—ASSIGNMENT OF ACCOUNTS—PREFERENCE—EVIDENCE.

Where, in an action by a trustee in bankruptcy to reach accounts assigned by the bankrupt firm as collateral security for loans and advances to them, the evidence is undisputed that neither the creditor nor the bankrupts were aware that they were financially embarrassed until an examination made just before their general assignment, and that when the accounts were assigned the business was supposed to be prosperous, a finding that the accounts were assigned in contemplation of insolvency or as a preference would not be justified.

2. SAME—SECRECY—MINGLING FUNDS.

Where a mercantile firm, for the purpose of securing their indebtedness to and further advances from their banker, assigned lists of accounts to such banker from time to time as collateral security, and, retaining the books, collected the accounts, depositing the proceeds with other moneys of the firm, neither the fact that such transactions were private nor that the moneys so collected were mingled with the moneys of the firm rendered the transaction illegal or fraudulent as to other creditors.

3. SALES—CHANGE OF POSSESSION—PLEDGE OF DEBT—NOTORIETY.

The rule pertaining to a change of possession of goods and chattels on a sale or pledge thereof, that the dealing must be open and visible because possession is evidence of ownership, does not apply to a sale or assignment of intangible property, as a debt, the necessities of business usually requiring that such transaction be private.

4. DEBTOR—TRANSFER OF PROPERTY—MANNER—CREDITOR.

Aside from the provisions of the bankrupt law prohibiting preferences, and subject to the rules of law relative to the transfers of goods and chattels, debtors may transfer and pledge their personal property to their creditor in any manner they see fit.

5. ACTIONS—AMOUNT RECOVERED—CONCESSION AT TRIAL—COSTS.

Where, in an action by a trustee to recover from a bank deposits made by the bankrupt, who was indebted to the bank, it is conceded at the trial, but not before, that the trustee should recover the deposits made after the bank knew of the bankrupt's insolvency, though the trustee recovers no more, he should recover costs.

McAdam, P. J., and Spring, J., dissenting.

Appeal from special term, Monroe county.

Action by John G. Stackhouse, as trustee in bankruptcy of the estate of Otis L. Humphrey and another, against Alexander M.

Holden. From parts of a judgment for defendant, plaintiff appeals. Affirmed.

Humphrey & Holdridge were copartners dealing in lumber, coal, and general produce at Honeoye Falls, in this state. The defendant was a private banker carrying on a bank at said village under the name of the Bank of Honeoye Falls. The firm did its banking business almost entirely with the defendant, and from 1896 until its failure in the latter part of 1899 its account with the bank was continuously overdrawn. On July 1, 1899, as collateral security for this overdraft, it assigned to the defendant current book accounts amounting to $17,903.36. On October 2, 1899, the firm made another transfer of its accounts to the defendant listed at $20,872.84. The accounts included in the latter assignment embraced those covered by the preceding transfer except the sum of $5,407.47, which represented new accounts. The amount of the overdraft July 8, 1899, was $16,912.98, and on October 4th $17,697.67, and on October 31st it had increased to $18,992.13. On November 28th following, the copartners made a general assignment for the benefit of their creditors. On December 6th, involuntary bankruptcy proceedings were commenced, and on the 19th Humphrey & Holdridge were adjudged bankrupts, and later the plaintiff was appointed trustee of their estate. The unsecured liabilities of the firm exceeded $67,000, while their nominal assets were less than $30,000. The trustee commenced this action August 6, 1900, to set aside the assignment of said book accounts made on the 2d day of October 1899, on two grounds: (1) That such assignment was made within four months of the filing of the petition in bankruptcy, and made with the intention of giving preference to the defendant over the other creditors of the firm, and that defendant had reasonable cause to believe that such intent induced the assignment; (2) that at the time of such transfer the said firm was insolvent, and said assignment was fraudulent and void, by reason of the facts which will more fully appear in the opinion.

## The following is the opinion at special term (NASH, J.):

"The fact that Mr. Holden did not know of the insolvency of Humphrey & Holdridge until it was disclosed to him just prior to their general assignment cannot, upon the evidence, be questioned. Besides his testimony, we have that of both Humphrey and Holdridge and Neil, their bookkeeper, that until the time they looked over the books of the firm with Mr. Holden, two or three days before the general assignment, they were not aware of the fact that the firm was financially embarrassed. There are no facts or circumstances from which to infer that they are not truthful in this, nor is it inherently improbable. It is not a new thing for a mercantile firm to suddenly find itself embarrassed financially, and be obliged to succumb. If Humphrey and Holdridge and their bookkeeper were not aware that the firm was in an embarrassed condition, it is difficult to understand how Mr. Holden could have had any reasonable cause to believe that the firm was insolvent at the time of the last transfer of accounts to him, or that there was any intention of giving him by such transfer a preference over other creditors. The business of the firm was at that time apparently prosperous. The purchase of the building lot and the construction recently thereon of the two houses indicated that the firm had the money to spare from their business for that purpose. The permanent loans made by Mr. Holden to the firm were being reduced. The business relations of Humphrey & Holdridge with the firm of Willoughby & Hathaway were unknown to Mr. Holden, except that he supposed that the paper passing through the bank represented an indebtedness of the latter; and their commercial standing he had ascertained was good. The few instances of checks coming to the bank from Lima and some overdue farmers' notes in the bank—isolated transactions, not of much importance of themselves as indicating the financial standing of the firm—did not come to the knowledge of the defendant. It seems to me that upon this branch of the case the burden then cast upon the plaintiff has not only not been met, but that the preponderance of the evidence is with the defendant.

"The other proposition of the plaintiff is that the method which Humphrey & Holdridge and the defendant adopted for the purpose of supplying the firm with capital as it should be needed to carry on its business was fraudulent in law; that is to say, the transaction, however honestly entered into and performed, is not permissible in law. There is no question here as to the actual good faith of the defendant and of Humphrey & Holdridge. The agreement was that the latter should collect the assigned accounts, and deposit the proceeds in the bank to their credit. They did this by collecting the accounts and depositing the proceeds, together with the other money of their business, in one account. The objection made on behalf of creditors is that the pledgors mingled the money of the pledgee with their own, and used it in their business; that the identity of the money collected and received from the assigned accounts was lost, and the general creditors of the firm were thereby injured. It appears that all of the money of the business —that which came from the assigned accounts and that which came to the firm in the course of trade—was deposited in the defendant's bank, or used directly in the purchase of goods, the avails of which were also deposited or went into accounts against customers, and from time to time assigned to the defendant. It also appears that some of the money was used by the members of the firm on personal account, but at all times there was a large amount of accounts not assigned which were in amount far in excess of any money applied to the personal use of the members of the firm. It is urged that by this method of giving security for the money defendant loaned to Humphrey & Holdridge, and the transaction of the business, it tied up their property, while at the same time it gave them absolute dominion over it, thereby creating a secret lien, and therefore a fraud upon creditors. In regard to the secrecy of the lien it may be observed that every pledge of securities may be, and generally is, done in secret. The dealings had with mercantile houses are always with knowledge that available bills and accounts receivable may be so used to procure credit or capital. The result of the exercise of dominion over the assigned accounts by Humphrey & Holdridge and the mingling of the moneys derived therefrom with that received in trade, so far as creditors are concerned, is the same as if the identity of the money which came to their hands from the assigned accounts had been preserved. If the latter method had been pursued,—the proceeds of the accounts would have been paid into the bank, and the credit set off against the overdraft,—the money borrowed at the bank by means of the overdraft would have been separately used in their business, new customers' accounts would have been made, and these in return assigned, and the process repeated to the end. In that case the identity of the money received from the accounts and the business would have been preserved, but the total amount would have been the same, whether kept separate or mingled together in one account. The rules pertaining to a change of possession of goods and chattels upon a sale thereof, or to the filing of a lien thereon, and the dominion required to be exercised by a purchaser, mortgagee, or pledgee of tangible property, cannot be applied to a sale or pledge of indebtedness intangible of itself, only the evidence of which, if in writing, is perceptible. The conditions are not the same, and the rules of law applicable to transfers of the two classes of property differ. As to one, the possession of which is evidence of ownership, the dealings must be open, visible, and public; while as to the other the business may be, as it usually is, private. The necessities of business require it. Aside from the provision of the bankrupt law prohibiting preferences, and subject to the rules of law relative to transfers of goods and chattels, debtors may transfer and pledge their personal property to their creditors in any manner they see fit; and any attempt to apply fixed rules for the transaction of the business would interfere with this undoubted right. The plaintiff's right to recover the amount of the deposit made after the insolvency of Humphrey & Holdridge became known to the defendant is conceded. It is suggested that it should be with costs to the defendant after the joining of issue, but, as there was no formal offer, and as the concession was not made until after the plaintiff had been to the expense of preparing for trial, the recovery should be with costs."

Argued before ADAMS, P. J., and McLENNAN, SPRING, WIL-
LIAMS, and HISCOCK, JJ.

Norman D. Fish, for appellant.
William N. Cogswell, for respondent.

PER CURIAM. Affirmed on opinion of special term.

SPRING, J. (dissenting). The village of Honeoye Falls contains
about 1,500 inhabitants, and the defendant and Humphrey & Hold-
ridge had been long acquainted, and the copartners carried on with
the defendant their banking business, which was extensive for a
country community. The overdraft at the bank increased from
$34.12 in December, 1896, to over $18,000 in October, 1899, and this
despite the apparently vigorous endeavors of the defendant to stem
the advance. There are several circumstances which, it seems to
me, lead incontestably to the conclusion that the copartners, when
they transferred the accounts to the defendant, and which composed
the bulk of their assets, realized that they had about reached the
climax of their attempt to carry on a large business without capital
and with a heavy overdue indebtedness, and sought to secure above
every one else the man who had long befriended them, and who alone
had rendered it possible for them to continue their business at all.
Let us examine the undisputed facts as they are testified to by the
defendant and Humphrey & Holdridge, and ascertain if their position
that they did not apprehend their insolvency finds reasonable sup-
port. As has been already stated, there had been a continuous
augmentation of the overdraft account at the bank, and it rose from
about $10,000 in January, 1899, to $18,000 in October of that year.
This large overdraft by a firm doing business in a country village in-
dicates that Humphrey & Holdridge were being hampered by the
lack of cash. They had purchased lumber for several years of
Willoughby & Hathaway, of Tonawanda, but for a year before their
failure had ceased to buy of them. They were, however, owing that
firm $7,000, which was evidenced by their notes, and which were
indorsed by Willoughby & Hathaway, and discounted with defendant,
evidently at the instance of Humphrey & Holdridge, as the defendant
did not know the members of the Tonawanda firm. These notes
had been taken up, and drafts drawn on Willoughby & Hathaway,
and accepted by them, were substituted in the place of the notes, and
these drafts were numerous, and were coming due daily to harass
and add to the perplexities of both Humphrey & Holdridge and the
defendant. There was a draft drawn by Humphrey & Holdridge in
the bank which had been overdue for over a year, and on which they
had received their pay, although not accepted by the drawee. In or-
der to meet small debts which they owed about Honeoye Falls,
they frequently gave a check on their account with the defendant,
and requested the payees named in the check to present it at the
bank in Lima, which was four miles distant from Honeoye Falls, and
the drawers of the check would pay 25 cents exchange in collecting
each check. This was done to gain time for a day or two in the

hope of getting their account with the defendant in better shape to meet the payment of the small sum to pass by the check. During the early fall of 1899 many creditors whose claims had been for a considerable time overdue were pressing Humphrey & Holdridge for pay, threatening to draw on them at sight, and complaining at their indifference and neglect. The frequency and urgency of these letters must have impressed the members of this firm with their inability to meet these obligations, and that their payment could not much longer be deferred. When they were compelled to pacify pressing creditors, they apparently did so by adding to the already burdensome load of the defendant, and increased their overdraft. When drafts came in, they would hold them perhaps a "couple of days; then they were either paid or returned." Notes given by the firm were falling due nearly every day. They were renewed, if possible, but, if payment was exacted, they were charged up to the firm account in the bank. These are some of the persuasive facts which impel me to the conclusion that Humphrey & Holdridge, during the summer and fall of 1899, must have understood they were unable to pay their debts, and that suspension of business was imminent. To be sure, they had never had much ready capital, and always did a kiting fast and loose business, but the pressure of insistent creditors and the absence of funds had become too oppressive to warrant any sane man familiar with the circumstances in believing they could go on longer. Many of the circumstances which have been recited are convincing when we come to consider their effect upon the defendant. All their banking business was run through his bank. He knew Humphrey & Holdridge had been buying lumber extensively of Willoughby & Hathaway, and the notes for these purchases had been negotiated by him until they aggregated $7,000. They became due, were unpaid, and for a time were renewed. Finally drafts drawn on Willoughby & Hathaway, and accepted by them, were substituted for the notes. The defendant must have known that the real debtors were Humphrey & Holdridge, and the change in the form of this large indebtedness and its continuance ought forcibly to have attracted the attention of any prudent man. The defendant knew that this overdraft was constantly piling up. He knew that the draft of over $1,000, and on the strength of which he had paid the sum it called for to Humphrey & Holdridge, had been lying unaccepted and dormant in his bank for more than a year. He held their note of $3,000 overdue for several years, and on which none of the principal had been paid, and another, originally of $2,000, but reduced somewhat, although no payments had been made on the principal since 1897. There was in his bank customers' paper to a considerable amount, which had been negotiated by this firm upon its indorsement. Between the time of the two transfers Humphrey & Holdridge apparently had collected from the accounts assigned in July about $2,500, and yet during the same time the overdraft had grown nearly $800, a potent fact showing the collections were not applied in accordance with the terms of the assignment to reduce this indebtedness. Humphrey & Holdridge testify, on the one hand, that they did not realize they were insolvent, and intended no prefer-

ence by transferring the accounts; and the defendant, on the other, that he did not know they were in desperate straits, and that he did not expect any preference. It is the circumstances—the undisputed facts—which are too convincing for me to credit the testimony of these parties, and in cases of this kind such circumstances must outweigh the protestations of innocence which are always made. To enable a transaction like this to stand would emasculate the bankruptcy law, the chief purpose of which is to secure equality of distribution of the assets of the bankrupt among his creditors. Pirie v. Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171; Crittenden v. Barton, 59 App. Div. 555, 69 N. Y. Supp. 559. The defendant had allowed this claim to absorb a large portion of the assets of his bank, and permitted this indebtedness to increase and mount up to proportions wholly unwarranted. The business of the firm was being conducted on the money of the depositors in the bank, and this is too flagrant a violation of prudent banking and ordinary business sagacity to be upheld simply because the participants in it vouch for their honesty. Two facts are essential to bring this transaction within the condemnation of the bankruptcy law: First, on the part of the insolvent debtors an intent to give a preference to the defendant by the transfer of these accounts; second, on the part of the defendant "reasonable cause to believe that it was intended thereby to give a preference." Nat. Bankr. Law, § 60, subd. "b." And both of these requirements have been fully satisfied in this case.

But, passing the first ground of attack upon this transaction, I think the transfer of these running accounts was fraudulent and void, and the facts upon which this conclusion is based are also supported by the undisputed evidence. When the assignment was made, the accounts were returned, and were to be collected by the assignors. If this authority ended by this permission, the transfer might be sustained, for the accounts in all probability could be collected more advantageously by Humphrey & Holdridge than by the assignee, and the natural place for the debtors to pay their demands was the place of business of the firm; but, in addition to this authority, Humphrey & Holdridge were to use the moneys collected in any way they saw fit. They had only one account at the bank of the defendant. Moneys collected from the assigned accounts as well as from those not assigned and the daily cash receipts were all placed in this common fund in this one account, or else were used by the firm at its place of business to meet its daily running expenses. Everything deposited was mingled together. This account was checked against by Humphrey & Holdridge to meet all demands as they arose. Their personal expenses, the expenses of carrying on the business, and debts of every kind were paid indiscriminately out of this fund, or out of the moneys collected from these accounts. When drafts were made upon them through the bank, when notes became due in the bank or were forwarded for collection, they and the interest and discount upon claims held by the defendant were all charged up to this account. Many accounts were not assigned, and collections upon those were treated in the same way. If any of the assigned accounts were collected at the place of business of

the firm and needed there, such moneys were used. In fine, there was no distinction between the assigned accounts, those not transferred, and the moneys received from cash sales, either at the bank or at the place of business. In short, the written transfer was a fiction in so far as by it there was any endeavor to tie up the accounts to the defendant. The real ownership of the firm continued as visible and definite as before the assignment. This control and use of the avails of the accounts when collected was with the full knowledge and assent of the defendant. In describing the use of the proceeds of these accounts by the firm, he testified:

"To my knowledge they used the assigned accounts in various ways. They went on collecting the accounts just as if they had not been assigned, and taking what they pleased of the money collected. They collected the money and deposited it or bought produce with it. I understood they were doing that. * * * When they brought money in to deposit to their general account, they turned the cash in as so much, regardless of whether it was my collection. If they had a hundred dollars in money, and some of it was from cash sales and some of it from collections of assigned accounts, it all went in indiscriminately. It was all treated as so much cash; all that came to me." And again: "That was a general account in my bank that they deposited to. They had but one account, and upon that account they drew all the checks they had occasion to draw on my bank for the payment of obligations to whomsoever they might owe."

And Mr. Humphrey gave a like recital of the way the business was prosecuted:

"We assigned some accounts to Mr. Holden October 2, 1899, and after they were assigned we went on collecting them, carrying on the general business with the proceeds. On this account in his bank we made deposits from time to time. In those deposits were moneys that we received in our business, and also moneys we received from collections of assigned accounts, and we drew checks on the bank for use generally in our business. * * * The parties against whom the accounts were were never notified that they were assigned. They were paid at our office, and ourselves or our clerks received the money. Some of that money we deposited, and some we used in our business."

The fraud which vitiates the transfer does not consist in the failure to deliver possession of the assigned accounts to the defendant, for choses in action are not the "goods and chattels" covered by the statutes condemning sales unaccompanied by delivery over of the property. State Trust Co. v. Casino Co., 19 App. Div. 344, 46 N. Y. Supp. 492; Bank v. Chaskin, 28 App. Div. 311, 315, 51 N. Y. Supp. 64. The vice here is that there was in fact no real transfer—no real vesting—of title in the assignee. It was an arrangement whereby the title and authority of Humphrey & Holdridge were to be unrestricted as long as they were able to shunt along their business, but, whenever the inevitable crash came, then by some sort of legerdemain the written assignment was to be stimulated into life to prefer the overdraft of the defendant. A transfer which at one time places no bar to the ownership of the assignor and in another exigency is intended to be absolute cannot be upheld against the creditors who are seeking an equal distribution of all the assets of the bankrupt assignors.

73 N.Y.S.—14

I am constrained, therefore, to dissent from a majority of my associates, and vote for reversal of the judgment.

ADAMS, P. J., concurs on the second ground discussed in the dissenting opinion.