## In re HUB CARPET CO.

(Circuit Court of Appeals, Second Circuit. April 17, 1922.)

### No. 235.

1. **Bankruptcy ⟐188(1)—Sending of list of accounts to creditor, to whom bankrupt had agreed to assign them, held equivalent to taking of possession.**

Under an agreement to assign accounts due and to become due as collateral security for loans, a list of accounts sent the creditor, with a statement that it was a list of the accounts assigned to him in accordance with the agreement, was equivalent to the taking of possession in the case of a chattel, or to the recording of a mortgage, and gave the creditor title to and possession of the accounts as against a trustee in bankruptcy subsequently appointed.

2. **Courts ⟐359—Efficiency of transfer of title determined by state law.**

The state law determines the efficiency of acts and transactions to effect the transfer of title of property involved in bankruptcy.

3. **Assignments ⟐46—Accounts receivable not "goods or chattels," within filing or recording acts.**

In view of Lien Law N. Y. § 230, and Personal Property Law N. Y. § 36, the latter section since repealed, accounts receivable are not "goods or chattels," and an assignment thereof does not come within the recording or filing acts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Goods.]

4. **Fraudulent conveyances ⟐137(2)—Doctrine of reputed ownership inapplicable to choses in action.**

The doctrine of reputed or ostensible ownership, under which one cannot, as against creditors of an insolvent, who became such on the faith of his apparent ownership of property, assert title to such property, does not apply to choses in action.

5. **Evidence ⟐20(1)—Utilization of accounts and choses in action by merchants a matter of common knowledge.**

It is a matter of common knowledge that a merchant utilizes his accounts receivable and other kinds of choses in action to keep his business liquid by selling or pledging them.

6. **Bankruptcy ⟐214—Formal assignment of accounts properly ordered.**

Where a creditor, to whom a bankrupt had agreed to assign accounts receivable, had acquired title and possession before the filing of the bankruptcy petition, it was proper to decree that the bankrupt or the trustee execute a formal assignment to him of the uncollected accounts.

7. **Bankruptcy ⟐188(1)—Assignee of accounts not entitled to accounts not reduced to possession before bankruptcy.**

Under an agreement by a bankrupt to assign accounts receivable as security for loans under which it from time to time sent the creditor lists of accounts receivable assigned to him, accounts not mentioned in such lists, or arising after the date of the last list, could not be claimed by the creditor; he having taken no steps to perfect his lien or reduce his collateral security to possession.

⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the Hub Carpet Company, bankrupt. From an order or decree, Wallace Benedict, as receiver, appeals. Affirmed.

Certiorari granted 258 U. S. ——, 42 Sup. Ct. 591, 66 L. Ed. ——.

Appeal from an order or decree of the District Court for the Southern District of New York, ordering the receiver of the bankrupt to account to petitioner, Aaron Ratner, for all sums received upon certain accounts, and denying the receiver's motion to pay over to him certain sums theretofore received by Ratner.

Hub Carpet Company was what is sometimes called colloquially a family corporation, with four officers and stockholders. One of these was Abner Ratner, the vice president. His father, Aaron Ratner, was not connected in any manner with the corporation, but wished to help his son. On May 23, 1921, the board of directors held a meeting at which the treasurer reported that a representative of the well-known house of W. & J. Sloan Company had suggested the advisability of Hub Company obtaining more money with which "to run the business," and that through Abner Ratner he, "the treasurer," had arranged to borrow a sum not to exceed $30,000 from Aaron Ratner upon the notes of the company, secured by present and future accounts receivable. Following this report, a resolution was duly adopted, authorizing the borrowing on notes and the delivery as security of "an assignment to the said Aaron Ratner of the books of account of the company."

Under the same date an agreement was entered into between Hub Company and Aaron Ratner, whereby Ratner bound himself to make loans from time to time up to $30,000, these loans to be evidenced by the notes of Hub Company. Further, Hub Company assigned and transferred as collateral security all accounts then and thereafter to become due in the ordinary course of business. Hub Company agreed to keep Ratner fully advised of its financial condition, and authorized him "to enforce this assignment at any time that in his judgment it may be for his interest to do so, notwithstanding the time for the payment of the notes has not in fact accrued." It is not disputed that it was understood that Hub Company should go on collecting its receivables and using the proceeds thereof, without accounting to Aaron Ratner, until he so required.

Pursuant to the agreement, Hub Company delivered to Aaron Ratner monthly a list of receivables, showing collections, changes in the accounts, and new receivables, or, in brief, a statement of the situation as it currently stood. The last letter—i. e., that of September 23, 1921—transmitting the September list, is typical of the routine between the parties. It read: "Inclosed find the September list of accounts receivable, assigned to you in accordance with our agreement of May 23, 1921." Up to September 17, 1921, Ratner had not asked for any proceeds of the receivables. At that time, however, he became disturbed because of the pressure of creditors, and demanded the protection of his agreement, and it was agreed that he should receive "checks" that would thereafter come in, in connection with its (the company's) accounts receivable."

Thereafter Ratner received the checks, trade acceptances, and notes which came in from Hub Company's debtors who were mentioned on the lists. These receivables were turned over to Aaron Ratner "in precisely the form in which they were received." It is this amount which the receiver demands, and it is the difference between $30,000 and this sum of $11,581.78, with interest, which Ratner demands from the receiver; the petition in bankruptcy against Hub Company having been filed September 26, 1921.

Selden Bacon, of New York City, for appellant.

Louis S. Posner, of New York City, for appellee Ratner.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above).   There is nothing in this record to warrent even a suggestion of fraud.   The loan by Ratner and the assignment by Hub Company of the accounts receivable constituted a legitimate and businesslike transaction, whereby a considerate father was willing to help his son and the latter's associates in maintaining what, at the time, seemed to be a hopeful business.   The questions involved, therefore, are solely questions of law. We shall speak of the receiver as a trustee in bankruptcy, and as though the application of Ratner had been made after the appointment of a trustee, in view of our recent decision in Matter of Max Mitchell (C. C. A.) 278 Fed. 707, filed January 18, 1922.

The status and powers of a trustee under section 47a of the Bankruptcy Act, as that section now reads since the amendments of 1910 (Comp. St. § 9631), were decisively dealt with in Bailey v. Baker Ice Machine Co., 239 U. S. 268, 275, 276, 36 Sup. Ct. 50, 60 L. Ed. 275.   In that case, Baker Ice Machine Company had made an agreement with Grant Bros. for the conditional sale of a machine, the title remaining in Baker Company until the purchase price was fully paid and the machine being in the possession of Grant Bros.   Under the recording law of Kansas (Gen. St. 1915, § 6508), a contract of conditional sale is valid between the parties, whether filed for record or not, but is void as against a creditor of the vendee. who fastens a lien upon the property by execution, attachment, or like legal process before the contract is filed for record.   The contract was made October 14, 1911, and filed for record May 15, 1912.

On June 11, 1912, Grant Bros. filed their voluntary petition in bankruptcy, and on the following day were adjudged bankrupts.   At that time the chattel which was the subject-matter of the controversy was found in the possession of the bankrupts.   Between October 14, 1911, and May 15, 1912, no creditor had "fastened a lien upon the property by execution, attachment or other legal process."   It was contended that section 47a, cl. 2, of the Bankruptcy Act, as amended in 1910 (36 Stat. 838, 840, c. 412 [Comp. St. § 9631]), gave a trustee the status of a creditor having such a lien.   The court held, however, "that the trustee takes the status of such a creditor as of the time when the petition in bankruptcy is filed."   See, also, In re Morris, 204 Fed. 770, 123 C. C. A. 220; Matter of P. Jesse Matton (C. C. A.) 279 Fed. 530, decided January 18, 1922.

[1] On September 26, 1921, the date of filing of the bankruptcy petition, in the case at bar, there were no receivables upon which any creditor had "fastened a lien."   On September 23, 1921, when the September list was delivered to Ratner, pursuant to the agreement of May 23, 1921, that act was equivalent to the taking of possession in the case of a chattel or to the recording of a mortgage under a state statute.   There was nothing further nor better which could have been done by the parties to perfect Ratner's lien, or to reduce to possession what the parties had called the "collateral security."

There was no way by which Hub Company could physically deliver notes, checks, or other evidences of debt from customers which had not yet been received, and the only practicable method of conferring

title and possession was by the delivery of the list in compliance with the demand of September 17, as contemplated by the agreement of May 23. Indeed, on this branch, the case is well within Union Trust Co. v. Bulkley, 150 Fed. 510, 80 C. C. A. 328; Gregory v. Morris, 96 U. S. 619, 24 L. Ed. 740; McCaffrey v. Woodin, 65 N. Y. 459, 463, 22 Am. Rep. 644. In Wilds v. Board of Education, 227 N. Y. 211, 125 N. E. 89, the court, in distinguishing that case from Titusville Iron Co. v. City of New York, 207 N. Y. 203, 100 N. E. 806, stated that the "all-important difference between the two cases is, however, the time of possession."

In view, therefore, of the fact that Ratner had title to the accounts receivable and possession thereof, as matter of law, prior to the filing of the bankruptcy petition, the sole remaining question is whether the agreement between Ratner and Hub Company was inherently void, because Hub Company was permitted to reserve the right to use the proceeds of these receivables until and unless Ratner demanded that they should be turned over to him.

[2, 3] It is "to be borne constantly in mind that the state law determines the efficiency of acts and transactions to effect the transfer of title of the property involved." Remington on Bankruptcy (2d Ed.) vol. 2, §§ 1140, 1275; Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995; In re Doran, 154 Fed. 467, 83 C. C. A. 265. In New York, accounts receivable are not "goods or chattels" (Lien Law [Consol. Laws, c. 33] § 230; Personal Property Law [Consol. Laws, c. 41] § 36 [repealed by Laws 1911, c. 571, § 2]; Niles v. Mathusa, 162 N. Y. 546, 57 N. E. 184), and therefore do not come within the provisions of recording or filing acts.

[4] There has grown up, however, the doctrine of reputed or ostensible ownership. This doctrine seems to have had its origin in Twyne's Case, 3 Coke Rep. 80b, referred to in Robinson v. Elliott, 22 Wall. 513, 22 L. Ed. 758, and in section 176 et seq. of Mr. Gerrard Glenn's thoughtful work on "The Rights and Remedies of Creditors respecting their Debtor's Property." The doctrine is thus stated by Mr. Glenn in section 173 of his book:

"The situation with which we will now deal is where a man, not the owner of the property, is held out as the owner under such circumstances as would be reasonably calculated to induce the extension of credit to him upon the faith of his apparent ownership. In such a case, when he becomes insolvent, the question is whether the true owner can assert his title to the property in question as against the persons who have become creditors of the apparent owner."

In Robinson v. Elliott, supra, a mortgage was executed which provided that the mortgagors—

"may remain in possession of said goods, wares, and merchandise, and may sell the same as heretofore and supply their places with other goods, and the goods substituted by purchase for those sold shall, upon being put into said store or any other store in said city where the same may be put for sale by said parties of the first part, be subjected to the lien of this mortgage."

The Supreme Court said:

"Manifestly it was executed to enable the mortgagors to continue their business, and appear to the world as the absolute owners of the goods, and

enjoy all the advantages resulting therefrom. It is idle to say that a resort to the record would have shown the existence of the mortgage, for men get credit by what they apparently own and possess, and this ownership and possession had existed without interruption for 10 years. There was nothing to put creditors on their guard. On the contrary, this long-continued possession and apparent ownership were well calculated to create confidence and disarm suspicion."

See, also, Frelinghuysen v. Nugent (C. C.) 36 Fed. 229; Griswold v. Sheldon, 4 N. Y. 581, 590; Stackhouse v. Holden, 66 App. Div. 423 at page 427, 73 N. Y. Supp. 203.

But the cases to which this doctrine of reputed or ostensible ownership has been applied are those where the personal property is visible. The American doctrine of reputed ownership, does not, however, apply to choses in action. As Glenn puts the point:

"It may be said that no one can be in the apparent ownership of a chose in action, because there is no possibility of an effective ostentation of ownership by means of possession."

It is, perhaps, going too far to say that men get credit only because of what they apparently own, or that they never get credit because of the ownership of choses in action which may not be physically seen. This distinction has developed historically, but a further reason for the exclusion of choses in action from the rule of reputed ownership is that courts in their decisions have been reflective of the course of business in the commercial world.

[5] It is matter of common knowledge that the merchant utilizes his accounts receivable and other kinds of choses in action to keep his business liquid, and every one expects that he may sell or pledge such choses in action for that very purpose. On the other hand, it is ordinarily assumed that the goods and chattels in his place of business belong to him and may freely be dealt with by him. It is mainly because of commercial usages and necessities that the courts have not included accounts receivable within the doctrine of ostensible ownership, but, on the contrary, have excluded them therefrom. Stackhouse v. Holden, 66 App. Div. 423, 73 N. Y. Supp. 203.

The case at bar does not turn upon any question as to the right of substituting security for that withdrawn, which was one of the questions in Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995, nor on the question as to whether a later transaction was merely the consummation of an earlier agreement, as in Chapman v. Hunt, 254 Fed. 768, 166 C. C. A. 214. Underlying these cases, as well as Greey v. Dockendorff, 231 U. S. 513, 34 Sup. Ct. 166, 58 L. Ed. 339, is this principle of exclusion from the reputed ownership rule, which we apply to this case. As Mr. Justice Holmes points out in Greey v. Dockendorff, supra:

"The rule of the English statutes as to reputed ownership may extend to debts growing due to the bankrupt in the course of his business but we have no such statute."

Nor on the facts in the case at bar was there (again to quote from Mr. Justice Holmes) "a moment when the goods [here the receivables] could have been attached." The case nearest that at bar is Stackhouse

v. Holden, supra, and, although the court was not unanimous, we think the opinion of Nash, J., ably stated the principles here applicable.

[6, 7] From the foregoing, it follows that the receiver (or trustee if since appointed) must account and pay over to Ratner any and all proceeds representing collections by the receiver or trustee of the debts set forth on the list of September 23, 1921, and on all prior lists up to an amount sufficient to pay the balance beyond $11,581.78 with appropriate interest. The decree below properly provided that the bankrupt or its trustee execute a "formal assignment" to Aaron Ratner of the accounts not yet collected. We are not informed as to whether there were any accounts due Hub Company not mentioned on these lists or arising between September 23d and September 26th. If there were such, Ratner is not entitled to the same, because he took no steps to perfect his lien in respect thereof, or to reduce such collateral security to possession.

The decree is affirmed, with costs.

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes