UNION TRUST CO. v. BULKELEY.

(Circuit Court of Appeals, Sixth Circuit. January 18, 1907.)

No. 1,564.

1. BANKRUPTCY—LIENS—PAROL ASSIGNMENT OF ACCOUNTS AND NOTES AS SECURITY.

A parol assignment by a man in business of the accounts and bills receivable which he should acquire in the course of such business to secure a person for becoming his indorser to enable him to raise money for use in the business creates a valid lien as against the assignor's trustee in bankruptcy where the assignment was made in good faith, although no notice of the same was given to creditors, and the notes and accounts remained in the possession of the assignor until his bankruptcy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 295.]

2. SAME—SUFFICIENCY OF PROOF.

A parol assignment of choses in action as security by a bankrupt prior to the bankruptcy may be established by the testimony of the parties alone where such testimony is uncontradicted and credible, the witnesses are not impeached, and there are no circumstances which cast doubt upon their truthfulness.

3. ASSIGNMENT—VALIDITY—LAW GOVERNING.

A parol assignment by a man in business of the accounts and bills receivable which he may acquire in the conduct of such business to secure an indorser of his paper, which securities were to remain in the possession of the assignor unless demanded by the assignee, is governed by the law of the state in which the business was carried on and the assignor resided, although the contract was actually made in another state, where the assignee resided.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Assignments, § 4.]

Appeal from the District Court of the United States for the Southern Division of the Eastern District of Michigan.

The following is the opinion of the District Court by Swan, District Judge:

Macauley was adjudicated a bankrupt on his own petition November 23, 1904. The petitioner is his brother-in-law and resides in Connecticut. The bankrupt had been engaged in business in Detroit for several years. He had received financial aid in starting in business from his father-in-law, the petitioner's father, who died in November, 1902, leaving a last will and testament in which he required repayment of the loan to the bankrupt and provided that in default thereof the amount—some $15,000—should be charged against the share of the bankrupt's wife in his estate. This fact was known to the petitioner and the heirs of the father. In January, 1903, the bankrupt visited Hartford and stated to petitioner, as the latter testifies, "that his business had outgrown his limited capital * * * and wanted to borrow money. * * * That if he could get additional capital—that is, for a number of years—in some way he thought he could make his business a success and very comfortably provide for his family in the years to come. * * * That is, he asked me if I could give him any money, and I told him I did not have any to loan him myself * * * no ready money, and he said if I would indorse for him he could borrow money in the Detroit banks, and he talked $15,000. It seemed more than I wanted to indorse for and I persuaded him to say he could get along with $10,000, and I asked him how I should be secured in any way, and he said all he could offer me as security was some insurance policies he had in the Ætna Life Insurance Company—four policies aggregating $15,000. He further said that he would assign to me the book accounts or any future book accounts as long as I continued these indorsements because the indorsements were for an indefinite period. He thought that he would not need any indorsement after three or four years, but, of course, could not tell, and with this understanding he returned to Detroit and arranged to borrow $15,000 with my indorsement. He sent the notes to Hartford, and I indorsed them and returned them to him. He got the money from the First National Bank. Those were the first notes I indorsed for him—four notes for $2,500 each." These notes were sent the bankrupt January 27, 1903, as is evidenced by the registry receipt of that date.

The petitioner testifies positively: That the indorsements were made on the assurance of Macauley's assignment of the book accounts to him, "because," as he states, "I would have had no security of any sort at all for my indorsement with the exception of these insurance policies which were new policies practically and had no value to me, and, of course, with the idea of continuing the indorsements from time to time I would have to have the book accounts, and it was my understanding as he talked to me that these book accounts and bills receivable at any time while I indorsed for him were pledged to me to cover my indorsements." That the bankrupt submitted to him a statement at the time of the agreement for indorsement showing bills receivable approximately $30,000 in amount, and assured petitioner that it was his privilege at any time to take the business to protect himself. Pursuant to this arrangement petitioner indorsed between January 27, 1904, and the bankruptcy for renewals and for accruing obligations of the bankrupt, some 40 promissory notes, all of which were produced and identified. Four policies of life

insurance—one for $1,000, two for $5,000 each, and one for $4,000—are produced and identified as those which were turned over to the petitioner when the parol assignment was made. But one of these has any cash value, and that is but $29.02. The evidence is undisputed that petitioner has paid $15,000 and upwards on his indorsement, and the proceeds of all the notes went into the bankrupt's business. The testimony of the petitioner fully corroborates in all essentials that of the petitioner as to the assignment, the time, place of its execution, and the consideration for which it was given. The proofs are explicit that the agreement covered all the book accounts and bills receivable "at that time or might exist at any time while I [petitioner] was indorser," and that this was the result of two conversations between him and the bankrupt; that petitioner had no knowledge before November, 1904, that Macauley was in financial straits. His first protested note—indorsed by petitioner—matured November 29, 1904, after the adjudication. There is therefore no question of preference in the case, nor is there any controversy as to the terms of the agreement under which the petitioner indorsed, save as to its legal effect. The only criticism upon the testimony in its support is that it comes from interested parties—the petitioner who is naturally desirous of recouping his loss, and the bankrupt, his brother-in-law, whose relation to him suggests a bias in the former's favor. The finding of the referee does not discredit the testimony of petitioner or the bankrupt. He expressly disclaims any reflection upon its truthfulness. His conclusion is in terms based upon two propositions: (1) The competency of the conversations to establish the assignment; and (2) the fact that possession of the accounts was not taken under the assignment. November 16, 1904—about a week before the bankrupt filed his petition for adjudication—he executed a written assignment to petitioner and to Sarah B. Macauley, his wife, of the book accounts and bills receivable of R. H. Macauley & Co. (the bankrupt's firm name), which confirmed the parol agreements it recited to have been made with the grantees for their indorsements; and expressed its purpose to secure Bulkeley and Mrs. Macauley against loss on such indorsements. This instrument was made without the knowledge or consent of Bulkeley, and solely because of the bankrupt's desire to further secure the grantees in pursuance of the agreements under which he obtained the indorsements. In itself it has no legal efficacy, and is not to be considered as against petitioner. Its primary purpose was to protect Mrs. Macauley if there should be a surplus after paying petitioner.

The referee's expressed reasons for the rejection of the claim are that he "was not convinced that there was such an absolute transfer of those book accounts as the law requires. * * * There is no delivery of possession, and, without reflecting in the least upon the testimony of parties as given, one can readily see that the door would be opened to fraud of the worst character, if upon the simple statement of the two parties in interest a transaction of this kind could be proved. * * * Again, in my opinion, if such an assignment were made, it would not take effect until the party proceeded to take possession of it."

The question presented, therefore, is simply as to the legal effect of the testimony—whether assuming its credibility it suffices to establish an assignment. It must be conceded that an agreement resting for its support upon the testimony of the two parties to it is suggestive of bias and open to suspicion, especially where the amount at stake is large, and there is no written evidence of the fact in controversy. But when it is not opposed by any evidence, except the considerations suggested by the interest of the petitioner and his relationship to the bankrupt, which the rejected as factors in his judgment, and undisputed facts tend to corroborate it, the referee's denial of the petition must be referred to the competency of the evidence accepting its truthfulness. It follows, therefore, that the exceptions to his ruling present a pure question of law.

The considerations tending to corroborate the testimony of Bulkeley and the bankrupt are: (1) The bankrupt visited petitioner intending and prepared to obtain financial aid upon the security of his bills receivable and his policies, as is evident from the fact that he presented the statement of the former showing $30,000 outstanding, and by his delivery of the policies—the only security of which he could make delivery. (2) Bulkeley immediately after the Hart-

ford agreement of January, 1903, began and thereafter continued his indorsements of the bankrupt's notes to the extent of $15,000, as he agreed. (3) That with Bulkeley's knowledge that the bankrupt owed the estate of his father-in-law (Bulkeley's father) $15,000 for moneys advanced for the bankrupt's business before 1903, which moneys by the last will of Bulkeley, Sr., who died in November, 1902, were charged to the share of his estate falling to the bankrupt's wife, it is highly improbable that petitioner would have loaned his credit by indorsement or otherwise to his brother-in-law without security, and in reliance solely upon the sanguine hopes of the bankrupt that "in two or three years his business would be in such a condition as to dispense with the aid of further indorsements." (4) Bulkeley had not the ready money asked by Macauley. His reluctance to lend his credit to the limit of the indorsement desired, and his effort to reduce the limit, strongly indicates, in connection with his knowledge of Macauley's indebtedness to the estate of the elder Bulkeley, that the conditions were such as to justify security despite relationship  It cannot be assumed that he was willing to hazard his own patrimony, as the bankrupt's wife had done, without security. (5) The delivery by the bankrupt of his life insurance policies to petitioner as part of the security for petitioner's indorsement is part of the res gestæ of the assignment. Their delivery as part security for the agreement of petitioner to indorse is undisputed. (6) That the bankrupt had no other security to give than the accounts and policies, and that the policies were known to petitioner to be practically worthless, and that Bulkeley required security, and the bankrupt verbally pledged or assigned the accounts receivable of his business as such security, is not contradicted by any testimony in the record. These and other circumstances are strongly corroborative of the truth of petitioner's testimony that there was a present assignment coterminous with the continuance of the indorsements made by the bankrupt to the petitioner which was followed pursuant to the agreement therefor by the petitioner's indorsements. That it was a valid agreement, though resting only in parol, cannot be gainsaid. It was to be performed in Michigan, and was there performed by the discount of the paper. It was not required to be recorded. Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 364, 47 N. W. 502; 12 Am. & Eng. Ency. Law (2d Ed.) 1055.

It was an appropriation of the current accounts as they accrued by way of pledge or security which continued in time until the bankruptcy of Macauley. The interest conveyed by an assignment to secure the assignee against liability as an indorser is commensurate in degree and duration with the liability it secures. Hamlin v. European Co., 72 Me. 83. The transaction has all the elements of an equitable assignment of that kind of property as effectually as if it were created by mortgage, although not evidenced by writing (Merchants' Nat. Bank v. Gregg, 107 Mich. 148, 64 N. W. 1052; McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554), and meets all the requirements to its validity as an assignment declared in Wright v. Ellison, 1 Wall. 16–22, 17 L. Ed. 555, where it is said "it is indispensable to a lien thus created that there should be a distinct appropriation of the fund by the debtor and an agreement that the debtor should be paid out of it." It is not material that some of the accounts had not yet accrued. A court of equity would enforce the assignment according to its intent.

In Peugh v. Porter, 112 U. S. 742, 5 Sup. Ct. 361, 28 L. Ed. 859, it is said: "Here as between Masser and Porter on the one hand, and Peugh on the other, there were words in the agreement of express transfer and assignment of the very fund now in dispute, though not then in existence which in contemplation of equity is not material." This language is apposite to the facts in this case. See, also, Ketchum v. St. Louis, 101 U. S. 306–316, 25 L. Ed. 999, where the court quotes with approval, as follows: "In Re Strand Music Hall Company, 3 De G. J. & S. 147, the question arose whether the company had made a valid charge on their real property. Lord Justice Turner said: 'There can, I think, be no doubt that it was intended by these agreements to create a charge upon the property of the company, but it was said by the official liquidator that this intention was not well carried into effect. I apprehend, however, that when this court is satisfied that it was intended to create a charge, and that the parties who intended to create it had power to do

150 F.—33

so, it will give effect to the intention notwithstanding any mistake which may have occurred in the attempt to affect it.'" Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed 485. The intention of the parties will be enforced in equity. Fourth St. Bank v. Yardley, 165 U. S. 635, 17 Sup. Ct. 439, 41 L. Ed. 855. It is no objection in a court of equity to the validity of the assignment that manual possession of the accounts was not given. There is no way by which an open account can be physically delivered. Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 385-387, 47 N. W. 502; Spring v. So. Carolina Ins. Co., 8 Wheat. 268, 5 L. Ed. 614; McDonald v. Daskam, 116 Fed 280, 53 C. C. A. 554. The agreement of the parties transferred to petitioner the equitable title thereto. That effect inheres in the term "equitable assignment"—"an assignment of that much of the debt which a court of equity will recognize and a court of law will not." First Nat. Bank v. Coates (C. C.) 8 Fed. 540–542; Holmes v. Evans, 129 N. Y. 140, 29 N. E. 233; 2 Am. & Eng. Ency. Law (2d Ed.) 1010, title "Assignments."

It was assumed by both parties that the bankrupt would meet his paper, otherwise the latter would not have indorsed. The equity of the transaction needs no vindication. Equally manifest is the intention of the parties that the indorser should be protected by the appropriation of these accounts to his indemnity. "That the owner of a chose in action or of property in the custody of another may assign a part of such rights, and that an assignment of this nature, if made, will be enforced in equity, is also the settled doctrine of this court:" citing cases. Fourth Street Bank v. Yardley, 165 U. S. 644, 17 Sup. Ct. 439, 41 L. Ed. 855; Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 385–387, 47 N. W. 502.

It is clear, also, that the agreement of the bankrupt was to be performed in and is controlled by the law of Michigan, as the notes indorsed were to be paid in Detroit, Mich. By that law no record of the assignment was required to be made. An assignment of open accounts is not an agreement to which the statute of Michigan regarding the record of chattel mortgages applies. That statute has reference only to goods and chattels capable of delivery. Preston National Bank v. George T. Smith Company, supra. There is therefore neither statutory, legal, or equitable defect in the assignment, nor valid objection to its enforcement. The objections that the bankrupt did not disclose its existence to the commercial agencies or the banks with which he dealt, and that in his financial statements he classified those accounts as part of his assets, making no mention of any incumbrance thereon, have had due consideration. Some of these objections are not sustained by the proofs, because the written statements were not produced, and parol evidence thereof was properly excluded by the referee upon objection. Conceding, however, that the facts were as claimed as to each and all of those matters, and also that the bankrupt admits that he did not put the assignment in writing because he "would have to transfer certain accounts, and I would not have been able to retain the money I collected on my accounts receivable and use it in paying the debts of the concern; * * * that he wanted to use all the money he took in to pay those or any other debts that the business owed," and "did not think he could do it if he put the assignment in writing"—these circumstances neither singly nor collectively avail to disprove the execution of the assignment. They were all acts or omissions of the bankrupt, not chargeable to the petitioner, nor, so far as the testimony shows, known to or even suspected by him. He was under no legal or equitable obligation to give notice of this agreement, and the law of Michigan made no provision for its record.

The contention that the agreement of January 3, 1903, was purely executory—an agreement to assign the accounts in futuro—not a present executed transfer thereof even by parol, is negatived by the testimony of both petitioner and the bankrupt. The latter states in terms: "He [petitioner] asked me what I would give him for security. I told him I would assign those accounts, and before we finished the conversation he asked me if I had assigned those accounts to him, and I said, 'Yes.' " The petitioner's testimony is equally explicit to the same effect as has been shown. The facts epitomized are that the bankrupt assured petitioner that if he would indorse the bankrupt's negotiable paper to the amount of $15,000 he would assign his book accounts to secure the indorser's liability, and then and there assigned them to petitioner

by parol for that purpose. The petitioner on the faith of that assurance and the contemporaneous assignment of that security indorsed Macauley's paper to the amount of $15,000. The proceeds of these indorsements went into the bankrupt's business and his creditors have had the benefit of them. It is conceded that the value of the assigned accounts is less than petitioner's liability as indorser. I am constrained by these facts to sustain the exceptions of the petitioner. The proofs establish an executed valid assignment of the accounts to petitioner January 3, 1903.

The trustee must pay the proceeds thereof to petitioner. The petitioner is entitled to costs.

H. Helfman, for appellant.

C. T. Alexander, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. Richard H. Macauley, who had been engaged in millinery business in Detroit since January 15, 1901, was in November, 1904, on his own petition, adjudged a bankrupt. The Union Trust Company was appointed receiver, and on December 21, 1904, was elected trustee. There came into its hands as trustee book accounts and bills receivable of the bankrupt of an appraised value of $11,000. On May 24, 1905, the appellee, Bulkeley, a resident of Hartford, Conn., and a brother-in-law of the bankrupt, filed a petition in the bankruptcy court, alleging that these accounts and bills receivable were pledged to him by the bankrupt on January 23, 1903, by a verbal assignment, as security for his indorsements of the paper of the bankrupt to be negotiated for the purpose of raising money to carry on the bankrupt's business; and that the petitioner had, in reliance on said pledge, indorsed the bankrupt's paper, and that there was then remaining due thereon upwards of $15,000. It was stated in the petition that it was understood, when the assignment was made, that the petitioner would not take possession of the accounts and bills until and unless he should deem it for his interest to do so, but that all the accounts and bills should be and remain pledged so long as the petitioner should remain liable on any of the indorsements. The prayer was that the court should adjudge the petitioner to be the owner of the accounts and bills, and should direct the trustee to turn them over to him. An answer was filed by the trustee which did not admit the assignment, but put the petitioner to his proofs. Upon the hearing before the referee, the petitioner and the bankrupt both testified, and other testimony was given concerning the matters alleged in the petition. The decision of the referee was adverse to the claim made by the petitioner. On a petition for review, the referee reported the evidence and his conclusions thereon, and touching the matter of the alleged assignment, said:

"There is no delivery of possession, and, without reflecting in the least upon the testimony of the parties as given, one can readily see that the door would be open to fraud of the worst character if, upon the simple statement of two parties in interest, a transaction of this kind could be proved. * * * In my mind it would be a most dangerous proceeding to permit parties, after the bankruptcy had occurred, to go in and prove an assignment upon a general conversation, such as the one in question."

The District Judge reached a different conclusion from that of the referee upon the question of fact as to whether the assignment had in truth been made as alleged, and, adverting to the above-quoted para-

graph of the referee's opinion, pointed out that the referee was satisfied of the veracity of the petitioner and of the bankrupt as witnesses, but nevertheless had held that the law required more reliable testimony than that of such persons in a case so circumstanced. And there would seem to be some justice in the criticism. If there could be no reflection upon the testimony of these witnesses, it could not fairly have been denied that it proved the assignment to have been made substantially as alleged. Both parties to the transaction swore to it unequivocally, and it is well-nigh impossible to say that the witnesses testified honestly and yet deny what their testimony proved. It was not a matter about which there could easily have been a mistake. The rule upon which the referee seems to have proceeded was too exacting. That evidence is sufficient in law which is directly to the point, is credible, and is uncontradicted. There was nothing in the circumstances which rendered their testimony so impossible or grossly improbable as to justify disbelief in the testimony of an honest man that the fact was as stated. These observations are made to show that the case comes here with a practical concurrence of the referee and the judge in regard to the facts. The circumstance that the referee committed a technical error in point of law is not material. And, adverting to the testimony, we cannot say that the conclusion reached by the court below was clearly wrong. It is subject to some criticism, such as that the parties were related by marriage, that the assignor did not report the transaction to the commercial agencies, and that the accounts and bills were left so long in the hands of the assignor. But these circumstances were explainable and not necessarily inconsistent with good faith. There are also some discrepancies in regard to incidental matters about which the memory might be at fault. But there is no serious discrepancy in regard to the essential facts.

It appears that on the 16th of November, 1904, seven days before the bankrupt filed his petition in bankruptcy, he executed an assignment of all his book accounts and bills receivable to his wife and Bulkeley, the appellee here, to secure them against loss from indorsements for him, and recited in it that it was made in pursuance of an agreement made before the making of such indorsements. But the making of this last assignment was without the knowledge or procurement of Bulkeley, and he did not learn of it until about the time the bankrupt filed his petition. As he claims nothing from it, it does not stand in the way of the claim he makes in his petition under the earlier assignment to himself. It is contended by the appellant that the contract of assignment was a contract to assign, and so was an unperformed agreement when the bankruptcy proceedings were taken, which was converted into a claim for damages for breach of contract merely by the operation of the bankrupt act. But there is no ground for this contention. If any contract was made, it was one which became of its own force operative as a lien. It is true that the subject to be affected by it was to be thereafter acquired; but, when acquired, it would become subject to the lien without any new or further agreement. This is something quite different from an executory contract.

Finally, it is contended that the assignment was a Connecticut contract, and that by the law of that state a pledge or mortgage of after-

acquired property does not attach until the mortgagee takes possession thereof. But we think the law of Michigan was the law which governed the transaction. It is true the contract was made in Connecticut, but it concerned a subject-matter located in Michigan, namely, book accounts and bills receivable—the products of a business to be carried on at Detroit. The indorsed paper would probably be used there, and the possession of the accounts and bills remained with the assignor at that place, where also the possession to be taken by the assignee in the contingency stated would be likely to occur. We think the parties intended their contract should be carried out in Michigan, where the bankrupt and his business were located. We do not, therefore, stop to inquire what effect the law prevailing in Connecticut would have upon the transaction if it were applicable.

There is no reason to doubt, and we do not understand that counsel for the appellant doubts, that in Michigan such a pledge or mortgage of after-acquired property if free from fraud is valid. The subject is not regulated by any statute in that state. The rights accruing from such a transaction depend upon equitable principles which are part of the general law. It is well settled that an assignment of choses in action by parol for the purposes of security is valid. In re Burnstine (D. C.) 131 Fed. 828; Draper v. Fletcher, 26 Mich. 154. And we have held that a chattel mortgage of after-acquired property is good as between the parties. Fisher, Trustee, v. Zollinger (November 3, 1906) 149 Fed. 54. The same doctrine has been applied to assignments of book accounts to be thereafter earned by the assignor. Tailby v. Official Receiver, L. R. 13 App. Cas. 523. And it is difficult to find any distinction in principle between a mortgage and any other appropriation of after-acquired property to the satisfaction of one's debts. McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554; Wilder v. Watts (D. C.) 138 Fed. 426.

The order of the District Court will be affirmed, with costs.