### In re STIGER.

(District Court, D. New Jersey. January 27, 1913.)

1. ASSIGNMENTS (§ 48*)—"EQUITABLE ASSIGNMENTS"—ESSENTIALS.

    To constitute an equitable assignment of an account receivable as security arising out of an unexecuted agreement to assign, there must have been a purpose to presently transfer all of the assignor's right, which would create an absolute indebtedness from the account debtor to the assignee, and not merely the creation of an obligation on the part of the assignor to make payment from the proceeds of the account.

    [Ed. Note.—For other cases, see Assignments, Cent. Dig. § 133; Dec. Dig. § 48.*

    For other definitions, see Words and Phrases, vol. 3, pp. 2434–2437; vol. 8, p. 7652.]

---

2. BANKRUPTCY (§ 155*)—EQUITABLE ASSIGNMENT—VALIDITY AGAINST TRUS-
TEE.

Petitioner sold material to bankrupt, who was a manufacturer, under an agreement that it should be secured by an assignment of accounts receivable. The goods were delivered, but there was a disagreement as to the assignment, and it was not executed until some time afterward and within four months prior to the bankruptcy. Petitioner knew the bankrupt's situation, and its testimony was to the effect that the assignment was to cover all accounts of bankrupt then outstanding and those that should be thereafter made, subject to a prior assignment to another creditor. It was also shown that bankrupt had no other resources from which to pay the current expenses of his business, and that he held and continued to collect the accounts and to use the proceeds in paying current bills. *Held,* that there was no such definite and specific agreement at the time of the sale as amounted to a present transfer even by equitable assignment, and that the assignment was voidable as against bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 155.*]

In Bankruptcy. In the matter of Augustus K. Stiger, trading as A. K. Stiger & Company and A. K. Stiger Manufacturing Company, bankrupt. On review of referee's order directing trustee to pay to D. C. Andrews & Company the sum of $4,158.81, proceeds of certain book accounts on the ground that such accounts were assigned to it by parol. Reversed.

Nathan Bilder, of Newark, N. J., for trustee.

Sigmund Solomon and D. C. Myers, both of New York City, for petitioner.

RELLSTAB, District Judge. The question presented on this review is whether the occurrences between such company and the bankrupt on or about the 19th day of January, 1911, amounted to an assignment of bankrupt's book accounts then existing and subsequently created.

The referee found:

"That at the time of the sale of the merchandise by the petitioner to the bankrupt, the bankrupt, in consideration thereof assigned to the petitioner by a parol assignment operating in præsenti his merchandise accounts then in existence and afterwards to be created, subject·to a prior similar assignment to his bank, as security for the payment of such merchandise."

He predicated such finding "upon the facts in the case and the following authorities: Union Trust Co. v. Bulkeley (C. C. A. 6th Cir.) 18 Am. Bankr. Rep. 35, 150 Fed. 510 [80 C. C. A. 328]; Tomlinson v. Bank of Lexington (C. C. A. 4th Cir.) 16 Am. Bankr. Rep. 632, 145 Fed. 824 [76 C. C. A. 400]; Williams v. Ingersoll, 89 N. Y. 508."

The petitioner does not contend as pledgee of such accounts, and in its brief it asserts that:

"They are not attempting to enforce the transaction as an equitable lien, which fails for want of a delivery as a pledge. We are enforcing an actual assignment of certain choses in action."

The bankrupt, a manufacturer of buttons, was adjudicated a bankrupt in involuntary proceedings instituted against him, on the 8th day

of June, 1911. In the petition presented to the referee claiming such book accounts or the proceeds, the petitioner based its right thereto upon a written agreement and accompanying assignment, bearing date the 17th day of February, 1911. After the filing of the trustee's answer to such petition, and on the day set for the taking of the testimony on the issues raised thereby, the petitioner sought and obtained permission to amend its petition; the petition as amended asserts that the assignment was made, not on the 17th day of February, 1911, the date of said written agreement and assignment, but on or about the 19th day of January, as already mentioned.

It is conceded that, if the petitioner's right to such book accounts depends upon the documents bearing such later date, it is not entitled thereto, as the consideration for such assignment, i. e., the sale and delivery of certain merchandise, took place several weeks prior thereto; and the agreement and assignment, assuming for present purposes that they cover a past transaction, were given to pay, or to secure the payment, of an antecedent debt, and therefore are invalid by the operation of the Bankruptcy Act. These documents, however, are said to be but confirmatory of the oral agreement previously entered into, and to put the same into legal form.

At the ancient common law, assignments, of things in action founded on personal covenants, were not recognized, and were not enforceable by the assignee either in his name or that of the assignor. The reason for this was that such an assignment destroyed the privity of contract then necessary to maintain an action at law. This theory was repudiated, however, at an early day by the Court of Chancery, which enforced such assignments in favor of the assignee. In more modern times the equitable rights of the assignee were recognized in courts of law, and he was permitted to enforce such assignments in an action at law, using the name of the assignor as plaintiff. By statute, the right to recover in cases of assigned choses in action in a court of law, in the name of the assignee, has been much enlarged. As a result of these changes many assignments which in former times were cognizable only in a court of equity are now enforceable at law. 3 Pomeroy's Eq. Jur. (3d Ed.) c. 8. In Sullivan v. Visconti, 68 N. J. Law, 543, 548, 53 Atl. 598, there is a concise, yet comprehensive, discussion by Justice (now Mr. Justice) Pitney, of the history of assignments of choses in action under the statute of New Jersey, and antecedent thereto, the laws of which state must furnish the test of the petitioner's rights in this case. Hiscock v. Varick Bank of New York, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945; Loveland on Bank. (4th Ed.) § 441. By section 19 of the act entitled "An act to regulate the practice of courts of law (Rev. 1903, 3 Comp. St. N. J. 4056):

"All choses in action arising on contract shall be assignable at law, and the assignee may sue thereon in his own name; but in such action there shall be allowed all set offs, discounts and defenses, not only against the plaintiff, but against the assignor before notice of such assignment shall be given to the defendant."

While the right to assign such choses in action is here given in comprehensive terms, and includes moneys to grow due on existing con-

tracts (Sullivan v. Visconti, supra), it does not make assignments of a part of a chose in action or of contingent interests and expectancies which have no present actual or potential existence, but rest in mere possibility only, enforceable in an action at law. Sternberg & Co. v. L. V. R. Co., 78 N. J. Law, 277, 73 Atl. 39. This is the general rule laid down by the United States courts. Mandeville v. Welch, 18 U. S. 277, 5 L. Ed. 87; Mitchell v. Winslow, 17 Fed. Cas. 527. But both such kinds of assignment are clearly cognizable in a court of equity. In both legal and equitable assignments, however, it is essential that the parties contemplate an assignment; and, while at law the mere agreement to assign is unenforceable, in equity such enforcement may be had as between the parties and others having notice thereof, upon the fundamental principle that equity will regard that as done which it was agreed should be performed—not merely what the chancellor may conclude should have been done, but what he finds the parties agreed to do, and which, through neglect or intervening causes dehors the agreement, was not done. Such agreement may be implied as well as expressed, but in case of an alleged assignment of a chose in action which, it is said, arises by implication, the implication must necessarily and exclusively point to an assignment, and not to a mere designation of a fund or assets out of which a payment is to be made. One who sells property has a right to dictate the terms upon which he will part with it. He may sell it on the credit of the debtor. He may insist upon security. If he insists that it was sold on the last-mentioned terms, and he fails to establish an actual transfer of the chose in action said to constitute the security, before he can obtain it or the proceeds thereof, on the ground of equitable assignment, he must show either an express agreement to so assign, or that the circumstances attending such sale necessarily imply a present intention to transfer, directly applying to the chose in question. Failing to do either, he will not be entitled to a decree to turn over to him such chose or its proceeds, but only a judgment for the amount of his claim, such as is pronounced in an action at law.

[1] Where enforcement of an agreement to assign is sought, it is essential that there was a purpose to presently transfer all that the assignor had or was to obtain in the funds or accounts which are the subject of the transaction. The sure criterion is whether the transaction between the parties, if assented to by the debtor of such alleged assignor, creates an absolute personal indebtedness payable by him to such alleged assignee, or whether it creates merely an obligation by such assignor to make payment out of that particular debt. If the former, an equitable property in the debt, and not a mere right of action against such primary debtor, passes to such assignee, and an equitable assignment is effected. 3 Pomeroy's Eq. Jur. § 1280. That a present appropriation of the fund or property is essential to an equitable lien or assignment is the rule in the courts of the United States and the state of New Jersey. The following are a few of the cases holding such doctrine: Wright v. Ellison, 1 Wall. (68 U. S.) 16, 17 L. Ed. 555; Christmas v. Russell, 14 Wall. (81 U. S.) 69, 20 L. Ed. 762; Trist v. Child, 21 Wall. (88 U. S.) 441, 22 L. Ed. 623; Smedley

v. Speckman, 157 Fed. 815, 85 C. C. A. 179, 19 Am. Bankr. Rep. 694; Bower v. Hadden Bluestone Co., 30 N. J. Eq. 171, affirmed Lyon v. Bower, 30 N. J. Eq. 340; Lanigan Adm. v. Bradley & Currier Co., 50 N. J. Eq. 201, 24 Atl. 505; Board of Education v. Duparquet, 50 N. J. Eq. 234, 24 Atl. 922; Weaver v. Atlantic Roofing Co., 57 N. J. Eq. 547, 40 Atl. 858; Seyfried v. Stoll, 56 N. J. Eq. 187, 38 Atl. 955.

In Wright v. Ellison, supra, it was held that:

"To constitute an equitable lien on a fund there must be some distinct appropriation of the fund by the debtor. It is not enough that the fund may have been created through the efforts and outlays of the party claiming the lien."

In Christmas v. Russell, supra, it was held that:

"A mere promise, though of the clearest and most solemn kind, to pay a debt out of a particular fund, is not an assignment of the fund even in equity. To make an equitable assignment there should be such an actual or constructive appropriation of the subject-matter as to confer a complete and present right on the party meant to be provided for, even where the circumstances do not admit of its immediate exercise. If the holder of the fund retain control over it, as ex gr., power on his own account, to collect it or to revoke the disposition promised, this is fatal to the thing as an equitable assignment."

In Smedley v. Speckman, supra, a case in this circuit, the Court of Appeals, by Judge Gray (157 Fed. page 819, 85 C. C. A. page 183), said:

"This testimony falls far short of evidencing the absolute appropriation by the assignor of the fund sought to be assigned, which is a fundamental requisite of a valid assignment, nor is there any evidence of that surrender by the assignor of all control over the fund that the law requires."

In Lanigan v. Bradley & Currier Co., supra, V. C. Pitney followed Trist v. Child, supra, and declared (50 N. J. Eq. page 206, 24 Atl. page 506) upon the authority of that case that the test was:

"Does the contract or arrangement in question authorize the depository of the fund to pay it directly to the creditor or party claiming as assignee, without the further intervention of the debtor or party originally entitled to it?"

He also distinguished equitable assignments from promises to pay out of a particular fund, saying that the distinguishing feature of such latter class was "that the party does not part with the control of the fund, but his promise is consistent with its being paid to and received by him."

In Weaver v. Atlantic Roofing Co., supra, it was said by V. C. Grey (57 N. J. Eq. page 554, 40 Atl. page 861) that the essential requisite of such an assignment was "that the assignor should presently strip himself of his interest in the fund or in some part thereof."

What shall amount to the present appropriation which constitutes an equitable assignment is a question of intention, to be gathered from all the language construed in the light of the surrounding circumstances. Pomeroy's Eq. Jur. § 1282. It is not necessary that the assigned indebtedness or chose in action shall be actually in being; if it exists potentially—that is, if it will in due course of things arise

from the contract entered upon—it passes by equitable assignment enforceable as soon as it is in esse. Id. §§ 1283–1288. Where the assignment is absolute in form, it will not be construed as a mere covenant to pay out of the fund because the assignor therein agrees to act as agent of the assignee in collecting the money and to pay the same over to him. Cogan v. Conover Mfg., Co., 69 N. J. Eq. 809, 64 Atl. 973, 115 Am. St. Rep. 629.

[2] Turning to the particular facts in this case, and which are said to show an equitable assignment: The merchandise constituting the consideration for the alleged assignment was sold in two lots, on January 31 and February 4, 1911, respectively. This merchandise was raw material, and was worked up by the bankrupt into manufactured product, upon the sale of which some of the book accounts claimed by the petitioner were created. Prior to January of that year the petitioner was a creditor of the bankrupt to an amount exceeding $6,000, for the payment of which an extension of two years was given. Such extension was a part result of negotiations that took place between the bankrupt of the one part, and the petitioner and the National Butchers' & Drovers' Bank of New York, another large creditor, of the other part. Another result was that the bankrupt's business was to be managed by one Charles O. Thompson, under the supervision of the bank and petitioner. Some time about the middle of January, after such new management had taken place (the exact time not being fixed), the purchase of raw material was discussed between either the bankrupt or his said manager, and Alfred E. Whitehouse, the managing member of the petitioner's firm, resulting in an agreement that petitioner would sell the bankrupt raw material, if it were secured against loss. None of the three witnesses to such agreement (Whitehouse, Thompson, and Stiger) attempted to give the actual language used at the time of such discussion; but it is apparent that the petitioner was unwilling to sell without security, and that the bankrupt intended that his accounts receivable, existing and to be created, were to be the petitioner's security, subject to the prior assignment thereof to the said bank, who had advanced, and was to advance, from time to time, the moneys necessary to meet the pay rolls and other business expenses. So far as the testimony discloses, no formal words of transfer in præsenti were used on such occasions, nor any that a writing formally evidencing such agreement was to be executed; but the subsequent conduct of the parties, rather than any testified-to express words, shows that a more formal agreement was contemplated by them. The letter of January 19, 1911, from the petitioner to bankrupt, recites:

"In confirmation of 'phone conversation with your Mr. Stiger to-day we have sold you about thirty tons of Tumaco ivory nuts at 5⅝ cents per pound, against your sixty days' note and as collateral security a private assignment of sufficient outstanding accounts receivable to keep the above covered."

The letter of February 7, 1911, following the last sale of merchandise, states:

"We had expected to hear from you to-day with the form of assignment agreement, and if you have not given this matter your attention we must

kindly ask that you do so immediately, as we would like to have this matter put in shape in accordance with the terms of sale."

Whitehouse, in answer to the question, "What was done in reference to putting the talk into the form of an agreement?" said:

"When we had the merchandise ready for delivery, I drew up a form of assignment which I submitted to Stiger and Thompson, and there were some objections to its form, and they arranged to have another assignment drawn up, and there was considerable talk as to that. Then an assignment was submitted to me and I made some corrections or suggestions, and finally we had one drawn up which was mutually satisfactory."

And further, with reference to the same subject, he testified, in response to petitioner's counsel, as follows:

"Q. Was that letter of January 19th answered by Mr. Stiger, do you know? A. I can't answer that; I don't know.

"Q. That January 19th letter was an agreement had between you at the time? A. Yes.

"Q. And it was on that agreement that you started to deliver the goods? A. Yes.

"Q. The actual drawing and signing of the paper was up between you from that date until February 17th? A. Yes.

"Q. Because of changes made by both of you in the papers? A. Yes.

"Q. On January 19th, or prior, when you had this talk, was there anything said then about their sending a statement of accounts? A. I don't think the details of it were thrashed out.

"Q. They were discussed in the lawyer's office when the paper was signed? A. Discussed prior to that. I drew up a form of agreement covering the details and submitted it to them, and they submitted something else, and finally we got to their lawyer's office, and this was the result.

"Q. What you are certain of is that prior to January 19th you refused to sell them unless they secured you with outstanding accounts? A. Yes."

Though the subsequently executed written agreements cannot, for the reasons already advanced, be relied upon as the basis of petitioner's right to such accounts, the fact that they were made after considerable negotiations concerning their terms may be resorted to, together with the testimony of what took place when the prospective sale and security were discussed and that intervening, and the conduct of the parties in relation thereto, in determining how the matter of security stood at the time of the sales of such merchandise. Two differently phrased agreements of assignment, one emanating from each, neither of which was satisfactory to both, were drawn before the agreement and assignment in evidence were executed. What these rejected agreements contained, and what the points in difference between the parties were, does not appear; but that they were vital must be assumed, else how can the "considerable talk" that ensued between the submissions of the two rejected agreements be accounted for, as well as the rejection of the agreements which, presumably, expressed the real understanding of the respective parties? If the points in controversy did not relate to matters essential to the establishment of such an equitable assignment, it was within the power of the petitioner to establish them. Its failure to do so leaves the court to draw but one inference, viz., that these differences prove that at the time of the alleged bargain the minds of the parties had not definitely met, and that no present transfer of the book accounts took place.

Petitioner being forced to rely upon the oral agreement made before the goods were delivered, the burden of proof is on it to show that by such agreement an assignment in præsenti was perfected, and that the goods subsequently delivered were sold in pursuance of that agreement. It is not necessary that such agreement should be expressed in as apt words as would be looked for in a formal document having such purpose in view. Equity looks at the final intent and purpose rather than the form. Hurley v. Atchison, T. & S. Ry., 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729. And if it appears that a completed transfer of the book accounts as security for such sales was then intended, a court of equity will enforce it as of that time, even though a more formal expression of such assignment was contemplated and subsequently perfected. McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554, 8 Am. Bankr. Rep. 543. But if at the former time the terms of the security were not fully determined, some being left open for further consideration, and such terms were not settled until after the sale and delivery of the goods, no such assignment results which either a court of law or equity will enforce. The whole conduct of the parties, from the time they first talked of security until the written agreement was formally executed, shows that the scope or extent of such security was not fixed until after the sales were made and the prohibitive period of four months had begun. However, aside from the question whether, as a matter of fact, a definite agreement to assign accounts was reached at a time before the four months' period began, it is perfectly apparent from the testimony that at no time was it agreed that the bankrupt should part with either his title to such accounts or his control over them. Nothing upon his books of account indicates that, at the time the deliveries of such goods were made or the notes given therefor, any of the accounts then existing were held in trust for the petitioner. No individuation of the book accounts ever took place. All are claimed to have been assigned for the benefit, first, of the bank, and, second, the petitioner. No other assets were available to continue the business, and, if the business was to continue as contemplated, the current expenses had to be met from their proceeds. Whitehouse's testimony in this particular is illuminating:

"Q. And you were unwilling to extend any further credit except upon security? A. Yes.

"Q. Now, what did Thompson and Stiger say to that? A. They agreed to give us security.

"Q. What kind of security was talked about? A. Assigned accounts.

"Q. Any specific accounts mentioned? A. All accounts over and above those assigned to the National Butchers' & Drovers' Bank for pay roll.

"Q. They were going to assign everything to you? A. Everything.

"Q. How were they going to pay their rent? A. I don't know.

"Q. How were they going to pay current bills? A. I don't know.

"Q. How did you expect the concern would be able to continue business if they assigned all accounts to you with the exception of those assigned to the bank? A. They were assigned as security.

"Q. Well, was that discussed in any way? A. Was what discussed?

"Q. The question of the continuation of the business if all accounts except those assigned to the bank went to you? A. Why, no."

The bankrupt's conduct in relation to such accounts, from the time of such alleged assignment until they were taken charge of by the receiver appointed in this cause, was one of absolute ownership and control. He collected them and used the proceeds thereof in paying current bills, and this was done by him, not contrary to any proven understanding between him and the petitioner, but of necessity in exact accordance therewith. This control by the bankrupt over such accounts, as heretofore shown, is fatal, as a matter of law, to the petitioner's contention that the effect of the oral agreement between the parties was to transfer such accounts to it.

The finding of the referee that there was "a parol assignment operating in præsenti" is not sustained by the evidence; and, as the invoking of the law by him is predicated upon such a finding of facts, it is unnecessary to consider the cases cited by him; but as Union Trust Co. v. Bulkeley, supra, is the main reliance of both the referee and the petitioner, and as the conclusion here reached might otherwise appear to be in direct conflict therewith, it may be advisable to note that in such case it was found as an explicit fact that there was a completed assignment of the book accounts there drawn into question. Furthermore, that in that case, unlike the one at bar, nothing is disclosed that shows that, in the state according to the laws whereof the agreement there considered was tested, the retention by the alleged assignor of control of the subject of the transfer made the transfer invalid as an assignment. In fact, in the Circuit Court of Appeals no reference is made to the bankrupt's appropriating to his own purpose the proceeds of the accounts; and while the District Court refers to such use, in neither was the effect of such use by the bankrupt considered as a factor upon the question whether an assignment was effected. The case of Christmas v. Russell, supra, which, as heretofore noted, makes the retaining of control over the fund by the bankrupt, with power on his own account to collect it or to revoke the disposition promised, fatal to equitable assignment, was not mentioned.

The order of the referee is reversed.