Walter E. HELLER, Canada Ltd., Appellant,

v.

Benjamin BUCHBINDER t/a Benjamin Buchbinder & Associates, Appellee.

No. 12586.

District of Columbia Court of Appeals.

Argued June 13, 1978.

Decided March 13, 1979.

William Clague, Bethesda, Md., for appellant.

Stanley E. Baritz, Rockville, Md., with whom Jerry Sussman, Washington, D. C., was on brief, for appellee.

Before NEWMAN, Chief Judge, and FERREN, Associate Judge, and MURPHY, Associate Judge, Superior Court of the District of Columbia.*

MURPHY, Associate Judge:

Benjamin Buchbinder, an independent manufacturer's sales representative, filed an action against Concept Furniture International Ltd. (Concept), a Canadian corporation, to recover commissions due him for the sale of office furniture manufactured by Concept. After suit was filed, he obtained a Writ of Attachment Before Judgment against funds held by Designs for Business Interiors (DBI), a Washington, D.C. retailer. The Court ordered DBI to deposit the amount claimed due, some $7,136, into the court registry. Walter E. Heller, Canada Ltd. (Heller) entered the case claiming a security interest in the funds and a superior lien to Buchbinder. The trial judge found for Buchbinder and released the funds to him. Heller appeals from this judgment, arguing that it·has a priority lien on the released monies. We reverse, because under D.C.Code 1973, § 28:9–103(5) Heller held a perfected securi-

* Sitting by designation pursuant to D.C.Code 1973, § 11 707(a).

ty interest in the attached funds, superior to any interest of Buchbinder.

## BACKGROUND

Concept is a Canadian corporation, engaged in the business of manufacturing and distributing office furniture. It maintains manufacturing facilities and corporate offices solely within Canada, and distributes its furniture within the United States through a number of regional sales representatives.

In 1972, Concept entered into an agreement with Buchbinder whereby Buchbinder was granted the right to act as a sales representative on behalf of Concept in a four state area, including the District of Columbia. Buchbinder's obligation under the agreement was to sell Concept products to selected dealers approved by Concept. In consideration of his efforts, Buchbinder was to receive a commission equal to 10% of the sales price reflected on all invoices billed by Concept, payable on the fifteenth day of each month following payment by the customer. During the period between June 1974, and November 1974, Buchbinder placed orders for Concept furniture in the amount of $71,360. The furniture so ordered was shipped, and virtually all accounts made in connection with the orders were paid.

Included in Buchbinder's sales of furniture during 1974 was a sale exceeding $10,-000 to Designs for Business Interiors (DBI), a District dealer-retailer. Concept acknowledged receipt of DBI's order by sending DBI an invoice, on the bottom left hand corner of which were the words:

Special Instructions

Payable to Walter E. Heller,
Canada, Ltd. Factors
Suite 3108, Box 64
401 Bay Street, Toronto 103, Ontario
to whom this account has been assigned. Remittance must be made only to them unless they instruct otherwise in writing. Any objection to this bill, or its terms, must be reported to them within ten days after its receipt.

Concept failed to remit the 10% commission due to Buchbinder for his 1974 sales. After two checks made payable to Buchbinder and drawn by Concept had been returned for insufficient funds, Buchbinder learned that Concept was bankrupt and in receivership in Canada.

In 1974, Concept entered into a "Factoring Agreement" with Heller, a Canadian factor and financier. Under the terms of the agreement, Concept promised to assign all of its accounts receivable to Heller; Heller in turn assumed the credit risk for approved sales in the event of a customer's inability to pay. The agreement also permitted Heller to request an assignment of book debts and accounts as security. Concept subsequently executed two documents in Canada pursuant to this agreement. The first, dated July 9, 1974, was an "Assignment of Book Debts and Accounts" between Concept and Heller. The second, dated November 15, 1974, was a "Schedule of Accounts" sold and assigned to Heller in accordance with the terms and provisions on its reverse side (that being an "Assignment of Sales Accounts" to Heller, executed by Concept). The "Schedule of Accounts" specifically identified the DBI accounts involved in the present controversy.

An unsigned financing statement was duly registered and filed by Heller in Toronto, Canada, in July 1974, and again in August 1974. The financing statement identified Concept as the debtor, Heller as the secured party, and generally described the collateral as an "assignment of book debts and accounts." The financing statement was not filed in the District of Columbia.

In 1975, Buchbinder filed a complaint in the Superior Court of the District of Columbia against Concept for the unpaid commissions. A Writ of Attachment Before Judgment was filed, approved, and served upon DBI, garnishing $7,136, the amount claimed due. DBI answered the writ by admitting possession of some $9,199.48 due Concept. In March 1975, Buchbinder moved simultaneously for the entry of a default judgment against Concept (who had not answered the

complaint) and for the entry of a judgment of condemnation of the garnished funds. In April 1975, prior to the entry of either judgment, Heller became involved in the suit as a third party claimant by moving to release the attachment on the ground that he had a priority interest in the funds.

In September 1975, an order was issued directing DBI to pay the attached funds into the Registry of the Court, pending the outcome of the case on the merits. A non-jury trial on the issue of the priority of the lien was held in June 1976, before the trial court which denied Heller's claim, and the attached funds were released to Buchbinder. Heller appeals that decision.

*ANALYSIS*

Heller argues that it perfected a security interest[1] in Concept's receivables (and in the DBI accounts in particular) within the meaning of D.C.Code 1973, § 28:9 -103(5), so that subsequent creditors such as Buchbinder may enjoy no priority over the security interest.[2] *General Lithographing Co. v. Sight and Sound Project, Inc.*, 128 Ga.App. 304, 196 S.E.2d 479 (1973). We agree with appellant and hold that subsection (5) applies in this case. Heller's security interest in the particular receivables was perfected when the account debtor, DBI, received notice of the assignment of accounts by Concept.

Section 28:9–103(5) of the D.C.Code provides that

Notwithstanding subsection (1) and section 28:9–302, if the office where the assignor of accounts or contracts rights keeps his records concerning them is not located in a jurisdiction which is a part of the United States, its territories or possessions, and the accounts or contract rights are within the jurisdiction of the District or the transaction which creates the security interest otherwise bears an appropriate relation to the District, this article governs the validity and perfection of the security interest and the security interest may only be perfected by notification to the account debtor.[3]

Research having disclosed no case construing this subsection, the court proceeds to interpret the statute according to general principles of construction and the comments of treatise writers.

Subsection (5) was enacted to provide an alternative means for perfecting a security interest where a transaction between two countries raises a problem as to the required place of filing financial statements. As Uniform Code Comment No. 8 to D.C. Code 1973, § 28:9–103 explains:

Optional subsection (5) makes an exception to subsection (1) and to Section 9–302 on the requirement of filing. Where subsection (1) refers to the law of a foreign nation for the validity and perfection of a security interest in accounts or contract rights, the governing law may be difficult or impossible to ascertain. Subsection (5) therefore provides a substitute rule for such cases, if the transaction is one which bears an appropriate relation to this state. Compare sections 1–105, 9–102. *If a buyer of goods in this state (account debtor) owes money to a foreign seller (assignor) who keeps his records abroad, and an assignment of the account to an assignee in this state is executed here, subsection (5) makes the Article applicable and makes notification to the account debtor the exclusive method of perfecting the assignment.* Where there are points of contact with other states as well as this state, the question whether the rela-

---

1. According to D.C.Code 1973, § 28:1–201(37), " 'security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to article 9 . . . ."

2. Title 28 of the D.C.Code is popularly known and cited as the Uniform Commercial Code—

Secured Transactions. *See* D.C.Code 1973, § 28:9 -101.

3. An historical note to D.C.Code 1973, § 28:9–103 indicates that subsection (5) was bracketed as optional in the 1962 Official Text of the U.C.C. but was included in the District of Columbia enactment of this subtitle.

tion to this state is "appropriate" is left to judicial decision. (Emphasis supplied). Buchbinder disputes the applicability of subsection (5), arguing that Heller was not exempt from the filing requirement of § 28:9–302. Pointing to the underscored language of Uniform Code Comment No. 8, appellee insists that subsection (5) is available to appellant only if "an assignment of the account to an assignee in this state is executed here." In this case, the assignee (Heller) is located in Canada and the assignment of accounts receivable was executed in Canada. In effect, appellee raises the issue of whether the underscored language of the Comment was intended to be a definitive explanation of subsection (5) or to be merely an example of when the subsection may be employed. Accordingly, we must examine the policies which underlie the execution and filing of assignments.

The Permanent Editorial Board of the U.C.C. adopted subsection (5) as part of its efforts in 1962 to amend the 1958 version of the Code.[4] The 1958 version provided no adequate means for achieving perfection of security interests by American banks and other financing institutions making loans on the security of accounts receivable owed to foreign sellers of goods by account debtors in the United States.

The Board reasoned that foreign sellers (such as Concept) making sales of goods to buyers in the United States on an open account basis would possibly maintain one or more offices in the United States at which records of the accounts would be kept. Thus, subsection (1) was written to provide that filing with respect to security interests in such accounts receivable should be made in the state or states in which the

foreign seller kept his records. Subsection (5) was written to provide that in the event the foreign seller did not maintain any office in the United States where records of accounts were kept, then the security interest in such accounts could only be perfected by notification to the account debtor.[5]

since the purpose of filing is to allow subsequent creditors of the debtor-assignor (Concept) to determine the true status of its affairs, the place chosen for filing must be one which such creditors would normally associate with the assignor; thus, the place of business of the assignee and the place of business or residences of the various account debtors must be rejected.[6]

When subsection (1) is relevant because the debtor-assignor has offices in various states in which the account records are kept, filing by the assignee in the jurisdiction where those offices are located would adequately notify subsequent creditors of the true status of the debtor-assignor's affairs. However, when subsection (5) is relevant because the debtor-assignor does not maintain an office in the United States, as is the case here, filing in the jurisdiction outside the United States where the assignor's office is located would be inadequate notice to subsequent creditors. Hence, subsection (5) provides that the assignee may perfect only by notice to the account debtor, and dispenses with the filing requirement. Common sense dictates that so long as notice is given to the account debtor of the assignee's security interest, the notice policies which underlie subsections (1) and (5) will still be satisfied when the assignment is neither executed in the District of Columbia nor made to an assignee in the District of Columbia.[7]

4. *Report No. 1 of the Permanent Editorial Board for the Uniform Commercial Code* (1962), at 52–54.

5. *Id.*

6. Uniform Code Comment No. 2 to D.C.Code 1973, § 28:9–103.

7. The Uniform Commercial Code underwent further revision in 1972. Although the 1972 amendments have not been adopted in the District of Columbia, they do serve to clarify the

policy underlying the 1962 version of the Code. Section 9–103 was completely rewritten to make it even clearer where perfection of a security interest must take place. The 1972 drafters apparently believed that subsection (5), framed in terms of the location of the assignor's records, did not promote the notice policy discussed above. Revised section 9–103(3)(c) expressly frames the filing rule in terms of the location of the foreign debtor. It provides for perfection of a security interest by filing at the major executive office in the Unit-

Buchbinder argues that even if subsection (5) were otherwise applicable, Heller has failed to perfect its security interest in the accounts by the required notification to the account debtor, DBI. To facilitate an analysis of such an argument, we find it useful to separate subsection (5) into its various elements of conditions.

Heller's only method of perfecting its security interest would have been to notify the account debtor, DBI, of its security interest in Concept's receivables, where:

1. the office where the assignor of accounts kept his records concerning them was not located in the United States, its territories, or possessions; *AND*

2. the accounts were within the jurisdiction of the District of Columbia; *OR*

3. the transaction which created the security interest otherwise bears an "appropriate relation" to the District of Columbia.

It is clear that Concept kept its records concerning the assigned accounts at its executive office in Canada. Thus, assuming that Heller gave DBI the required notice, Heller would need to prove either that the DBI accounts were within the jurisdiction of the District of Columbia or that the transaction which created the security interest bears an "appropriate relation" to the District of Columbia.

Since we find that the transaction which created the security interest in the receivables in question bears an "appropriate relation" to the District of Columbia, we find it unnecessary to determine whether the DBI accounts existed in the District of Columbia or in Canada.[8]

Gilmore, *Security Interests in Personal Property*, Vol. 1 at 331 (1965), discussing the meaning of "appropriate relation" under subsection (5) states that:

> "Otherwise" seems to mean that, even if the accounts and contract rights are not, on some theory, within the jurisdiction, the Article is nevertheless to be applied if the "transaction" bears an "appropriate relation": thus the provision is open-ended and the courts are invited to move beyond the common situs theory.[9] The phrase "appropriate relation" is taken from the Code's general choice of law provisions (Section 1–105), so that Section 1–105 case law will be relevant to Section 9–103(5).[10]

---

ed States of the foreign debtor or, alternatively, by notification to the account debtor. It therefore makes sense to read the previous section 28:9–103 as requiring Heller to perfect its security interest by giving notice to the account debtor, since Concept had no major executive office in the United States.

**8.** D.C.Code 1973, § 28:9–106 defines "account" as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." Assuming *arguendo* that Heller's right to payment by DBI is an account, it is difficult to state where that right exists. Gilmore, *Security Interests in Personal Property*, Vol. 1 at 331 (1965), remarks that the reference in Subsection (5) to the location of the accounts invites courts to make use of pre-Code common law rules relating to the situs of choses in action. But pre-Code case authority is ambiguous. It is possible to find authority for the proposition that such accounts are "located": (a) where the assignor resides: *Union Trust Co. v. Bulkeley*, 150 F. 510 (6th Cir. 1907); (b) where the assignee resides: *Appeal of Colburn*, 74 Conn. 463, 51 A. 139 (1902); (c) where the debtor resides: *Gordon v. Vallee*, 119 F.2d 118 (5th Cir. 1941), and see *Geo. H. Jett Drilling Co. v. Ft.*

*Tibbets*, 230 F.Supp. 58 (W.D.La.1964); (d) where the assignment was made; and (e) where payment is to be made. Accordingly, rather than decide where the DBI accounts were located, we base our opinion solely on the "appropriate relation" test.

**9.** See note 8 *supra.*

**10.** D.C.Code 1973, § 28:1–105(1) provides in pertinent part that ". . . when a transaction bears a reasonable relation to the District and also to a state or nation the parties may agree that the law either of the District or of such state or nation shall govern their rights and duties. Failing such agreement this subtitle applies to transactions bearing an appropriate relation to the District." While it appears that Concept and Heller designated that "the validity, interpretation, enforcement, and effects" of their Factoring Agreement would be governed by Canadian law to the extent permitted by Section 28:1–105(1), they cannot do so when the rights of third persons might thereby be prejudiced. Accordingly, when a security interest is involved, Section 28:9–103(5) controls rather than Section 28:1–105(1). *See Industrial Packaging Products Co. v. Ft.*

Uniform Code Comment No. 3 to D.C. Code 1973, § 28:1-105 sheds additional light on the problem of deciding when a transaction bears an "appropriate relation" to the District:

> Where a transaction has significant contacts with a state which has enacted the Act and also with other jurisdictions, the question of what relation is "appropriate" is left to judicial decision. In deciding that question, the court is not strictly bound by precedents established in other contexts . . . Application of the Code . . . may be justified by its comprehensiveness, by the policy of uniformity, and by the fact that it is in large part a reformulation and restatement of the law merchant and of the understanding of a business community which transcends state and even national boundaries.

The Comments suggest that the Permanent Editorial Board of the U.C.C. desired a broad and flexible interpretation of the "appropriate relation" test. Case law is sparse and inconclusive, and the term "appropriate relation" has been given various interpretations, but there are primarily two approaches: (1) Under a minimal contacts or "any relationship" test, the court requires only those minimal contacts sufficient to preclude constitutional violation.[11] Most courts applying this test simply outline the transaction and conclude that there was an appropriate relation to their state, without discussing which contacts were determinative.[12] (2) Under an "interest analysis" or "center of gravity" test, the forum court considers the contacts of the states involved, weighs the states' relative interests in the transaction, and then applies the law of the state having the most "significant interest" to the transaction and the parties.[13]

The "any relationship" interpretation of the "appropriate relation" test is a forum-oriented rule which assures only that a forum court will apply its states laws in as many situations as possible under minimal Constitutional standards. By contrast, an "interest analysis" interpretation does not assure that the forum court will apply the law which most benefits its own citizens. Theoretically, if the forum courts adopt the latter approach, state legislatures will be induced to agree upon mutually beneficial laws, regardless of the forum, and in this way the U.C.C. goals of predictability and uniformity in commercial transactions should be promoted.[14]

If this court applied an "any relationship" interpretation of the "appropriate relation" test, it would have no difficulty finding the minimal contacts with the District in this case. The sale to DBI was made in the District, the furniture was delivered to DBI in the District, and the proceeds of the sale were garnished in the District by Buchbinder, a sales representative for Concept doing business in the District. But even if this court applies the tougher "interest analysis" interpretation, we conclude that the District has a significant enough interest, on these facts, to constitute an "appropriate relation to the District."

---

*Pitt Packaging Intl., Inc.*, 399 Pa. 643, 161 A.2d 19 (1960). At any rate, the question is largely academic. No third party would be prejudiced by application of Canadian commercial law instead of Article 9 of the D.C.Code, at least in the context of determining whether Heller perfected his security interest in the DBI accounts. Indeed, although the trial court found Heller's financing statement to be defective because it was unsigned (*see* Section 28:9-402(1)), the parties below did not dispute that under Canadian law, Heller had perfected his security interest.

11. The replacement of a "contacts" test enumerated in the 1952 version of the Code with the "appropriate relation" test appears to have been largely intended to blunt constitutional attacks on the section rather than to narrow substantially the permissible application of the Code. *See Conflicts of Laws and the "Appropriate Relation" Test of Section 1-105 of the U.C.C.*, 40 *Geo.Wash.L.Rev.* 797, 801 (1972).

12. *Skinner v. Tober Foreign Motors, Inc.*, 345 Mass. 429, 187 N.E.2d 669 (1963).

13. *Tucker v. Capitol Machinery, Inc.*, 307 F.Supp. 291 (M.D.Pa.1969).

14. 40 *Geo.Wash.L.Rev.* at 806.

Under the circumstances, we do not have to decide whether Canada or the District of Columbia has the greater interest in the law to be applied. The parties do not dispute that Heller perfected his security interest in Concept's receivables under Canadian law by filing financing statements in Toronto. While providing notice to Canadian creditors of Heller's interest in Concept's receivables, the filing did not constitute notice to United States residents. The record does not show and the parties have not briefed the question whether, under Canadian law (as under the UCC), Concept's notice to DBI of Heller's security interest sufficed to protect Heller's interest and give it priority over subsequently-perfected interests. But whatever the answer to that question, the District's interest in the transaction was sufficient to show an "appropriate relation" in determining the relative rights of Heller and Buchbinder. While an "interest analysis" of the "appropriate relation" test has sometimes called for a choice of applicable law depending on the jurisdiction with the greater interest, we conclude that Canada could not complain about the application of District of Columbia law when the result favors a Canadian creditor, Heller.

The conditions for application of subsection (5) having been met, the remaining question is whether Heller indeed gave DBI the required notification of his security interest. We hold that the words on the invoice sent to DBI constituted notice, sufficient to satisfy the requirements for perfection under subsection (5). Under section 28:1–201(26), a person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course, whether or not such other actually comes to know of it.

We therefore conclude that Heller perfected his security interest in DBI's outstanding obligation to Concept within the meaning of D.C.Code 1973, § 28:9–103(5), and that this interest was superior to Buchbinder's lien by attachment.[15] The judgment below will be reversed, with directions to the Clerk to enter judgment for Heller.[16]

*So ordered.*

---

15. The trial court ruled as a matter of law that Buchbinder was an employee of Concept and that as such his claim for commissions was exempted from Article 9 as involving the "transfer of a claim for wages, salary, or other compensation of an employee." Section 28:9–104(d). Our reading of the record satisfies us, however, that Buchbinder was an independent sales representative for Concept and that section 28:9–104(d) is inapposite. *Massachusetts Mutual Life Insurance Co. v. Central Penn. National Bank*, 372 F.Supp. 1027 (E.D.Pa.1974).

We also reject appellee's argument that the "reserve" provision in the factoring agreement solves this case. Appellant's interpretation of the "reserve" provision clearly accords with general business practices under the U.C.C.

The 10% reserve was retained by Heller to provide for disputes against Concept which Heller was authorized, but not required, to settle, and to provide a reserve against which it could charge back monies owed to it by Concept. The reserve was not meant to be drawn upon to cover claims by all of Concept's non-retail customer creditors.

16. Since we hold that Heller held a perfected security interest in the DBI accounts superior to any interest to Buchbinder, we do not consider whether Buchbinder became a lien creditor without knowledge of the security interest and before it was perfected. D.C.Code 1973, § 28:9 301(1)(b).