## McDONALD et al. v. DASKAM et al.

### ROBERTS v. McDONALD et al

#### (Circuit Court of Appeals, Seventh Circuit. May 7, 1902.)

#### Nos. 819, 820.

1. INSURANCE—TRANSFER OF INTEREST IN POLICY—VALIDITY.

A mortgagor corporation procured a loan from a bank under a parol agreement by which the mortgagee was to become surety therefor, and the mortgage, together with the insurance on the mortgaged property, which was payable to the mortgagee, was to be given as collateral security. The policies of insurance were in the hands of the agent from whom they were procured, who held them for the parties interested. Advances were made by the bank, under the agreement, from time to time, on drafts drawn by the corporation on the mortgagee; and subsequently the corporation executed its note covering the same, in favor of the mortgagee, who indorsed it to the bank. The note contained a clause reciting the deposit with the payee of "certain property, as stated below, as collateral security," with the further description, "Fire insurance policies, should fire occur." The mortgage was delivered to the bank, but the policies remained in the hands of the agent until the property was destroyed by fire. Held, that the parol agreement respecting the insurance was not supplanted by the written agreement in the note, but, being consistent, the two should be construed together, and, so considered, did not create a common-law pledge of the policies, to the validity of which an actual delivery was essential, but an equitable assignment of a beneficial interest in the policies, should a fire occur, which gave the mortgagee, on his payment of the bank's debt, a lien on the proceeds of the policies for the amount thereof, in addition to the amount of his mortgage debt.

2. SAME—TRANSFER AFTER LOSS—PRIOR EQUITIES.

The attaching of riders to insurance policies under which a loss has occurred, making the loss payable to a creditor holding notes of a prior date, and the delivery of the policies to such creditor, where there had been no prior agreement for such security, gave the creditor only such interest in the proceeds as the assured then had, and subject to all equities existing against such proceeds in favor of others at the time the loss occurred.

8. BANKRUPTCY—PREFERENCE—DATE OF TRANSFER OF PROPERTY.

Where a borrower made an equitable assignment of the proceeds of fire insurance policies as collateral security for a loan, the lien of the creditor dates from such assignment, and not from the actual delivery of the policies to him after a fire had occurred; and the bankruptcy of the debtor more than four months after the assignment did not render the transfer void, under the bankruptcy act, as an unlawful preference, although the policies were delivered within that time.

Appeals from the District Court of the United States for the Eastern District of Wisconsin.

On February 23, 1897, the Wittenberg Veneer & Panel Company, located at Wittenberg, Wis. (hereinafter called, for brevity, the bankrupt), executed to Edward Daskam, of Antigo, Wis., its note for $6,000, at one year, with interest, secured by mortgage on certain real property in the village of Wittenberg, where the bankrupt operated a lumber mill. The mortgage contained an insurance clause providing for insurance in the sum of $6,000 or over, the policies to be assigned to the mortgagee as collateral. This mortgage was duly recorded on the 19th of November, 1897, and on March 5, 1898, payment of the debt was extended for two years. In the latter part of December, 1898, or early in January, 1899, the bankrupt desired to borrow money with which to purchase logs to stock its plant, and requested Daskam to go security at the First National Bank at Antigo for an amount not to exceed $5,000; and it was agreed between them that Daskam should go such security at the bank, and should assign to the bank as collateral the $6,000 mortgage, and that in case of fire the bank and Daskam should have the benefit of the insurance upon the property to satisfy the indebtedness. On January 12, 1899, Edward Daskam arranged with the bank touching the proposed loan, whereupon the bank addressed the following letter to Thomas E. Daskam, who was the son of Edward Daskam, and the manager of the Wittenberg Veneer & Panel Company:

"Dear Sir: Your father was in this morning in regard to securing a loan of $5,000 for you, which I promised him on the following terms: Notes of $1,000 or $2,000, as you wish, to be given for ninety days, at seven per cent., until amount of loan amounts to $5,000; loan to run, or a portion of it, until July next, if you so desire, and you to have the privilege of paying any note at maturity; money to be deposited in this bank, and checked out as you may need it. Your father to place with us, with his indorsement, the $6,000 mortgage on your plant, and to indorse all notes made by you to this bank. Insurance on your plant payable to us in case of loss. Now, we are pleased to make you the loan, and hope you will transfer your entire business to this bank, as I believe it will be greatly to your interest to do so; and I assure you we will at all times do whatever we can that may be to your interest. Your father sent you a statement to fill up before we commenced business, and, I would suggest that you come up and arrange the matter personally, and bring up insurance policies, having had them made payable to us.

"Yours truly, L. D. Moses."

Under this arrangement the bank loaned and the bankrupt received moneys as follows: January 19, 1899, $1,000; February 10, 1899, $1,000; February 21, 1899, $1,000; March 2, 1899, $1,000. The way the business was done was this: When the bankrupt desired money, it drew its drafts upon Edward Daskam for the respective amounts stated, deposited them for collection in the bank of Wittenberg, and through that bank they were forwarded to the Bank of Antigo, and apparently (the drafts offered in evidence, with a single exception, not being included in the record) the Bank of Antigo drew its drafts for the respective amounts upon a bank in Milwaukee to the order of Edward Daskam, and sent them in the usual course of business to the bank at Wittenberg for the bankrupt. Edward Daskam gave his notes to the Bank of Antigo for the amount of each draft at the time, except that the drafts of February 10th and February 21st were embodied in one note. The real estate mortgage and note were delivered by

Edward Daskam to the bank at or about the time of the arrangement, but no formal assignment was made to the bank until March 1, 1899. The money thus obtained by the bankrupt was used by it in the purchase of logs for its mill. On May 15, 1899, at the end of the logging season, the bankrupt gave to Daskam its note for $4,106, payable August 10, 1899; being amount received from the bank, with the interest. The note contained this clause: "Having deposited with Edward Daskam certain property, as stated below, as collateral security to this note, for value received I hereby authorize said Edward Daskam, or assigns, on the nonpayment of this note at maturity, to sell said property at either public or private sale, with or without further notice to me, and to apply the proceeds thereon. Fire insurance policies, should fire occur." Daskam indorsed upon this note a guaranty of the payment, and delivered it to the bank as further collateral security. There was a further agreement between the three parties and the insurance agent that the policies of insurance should be renewed as they should expire, and the bankrupt, if able, was to pay the premiums; otherwise the bank or Daskam was to pay them. Prior to the arrangement stated, policies of insurance had been issued by different companies, which remained in the possession of the insurance agent in that locality,—he holding them for the parties interested,—and which contained the clause, "Loss or damage, if any, payable to Edward Daskam, mortgagee." At the time of the fire there was $12,500 insurance upon the plant. in six different companies. Four policies (being in renewal of prior insurance) were dated respectively June 1, 1899, and each contained the clause, "Loss or damage, if any, payable to First National Bank of Antigo, Wisconsin, mortgagee." Two other policies, dated, respectively, August 15 and September 2, 1898, aggregating $3,500 in amount, each contained a clause in the body of the policy, "Loss or damage, if any, payable to Edward Daskam, mortgagee," with a subsequent indorsement, under date of March 7, 1899, "Loss, if any, under this policy, shall be adjusted with the insured herein named, and payable to the First National Bank of Antigo, Wisconsin, mortgagee, as its interest may appear." There was a subsequent indorsement, under date of July 21, 1899, upon each of the two policies: "Loss, if any, under this policy, shall be adjusted with the assured, and payable to R. W. Roberts as his interest may appear. H. G. Borgman, Agent." This was done, at the request of the president of the bankrupt, to secure Roberts' debt,—subject, as he states, to other claims, —but was not done with the knowledge or consent of either Daskam or the Bank of Antigo. On June 15, 1899, and before the fire, Daskam paid the bank on account of the money advanced $3,800, and paid the balance on December 9, 1899; taking an assignment to himself from the bank of its rights to the proceeds of the insurance, a reassignment of the original mortgage, and an assignment of the note of May 15, 1899. On July 21, 1899, Roberts was an unsecured creditor of the bankrupt, to the amount of about $3,600, for money theretofore loaned; and on that day, at the request of the president of the bankrupt, the agent indorsed upon the several policies the clauses stated; retaining, however, possession of the policies. On the 23d of July, 1899, the plant was destroyed by fire; the loss amounting to about $30,000. Thereupon the agent delivered the six policies to the bankrupt, who delivered to the bank four of the policies, and delivered to Roberts the two policies so indorsed. There is conflict of evidence whether the two policies so indorsed to Roberts were passed from the possession of the insurance agent, and whether they were delivered to Roberts before or after the fire, but the fact is not deemed material. The loss under the four policies was adjusted at $8,520.01. The loss on the two policies was adjusted at $3,313.34. After the fire the bank paid $736.10 for premiums on all the policies, and this amount was repaid to the bank by Daskam when the loan was closed. On August 1, 1899, the bankrupt executed a voluntary assignment for the benefit of its creditors, under the state law; and the fire loss, as to the amount, was adjusted by its assignee in those proceedings, with the several companies insurers. On October 19, 1899, a petition for involuntary bankruptcy was filed by certain creditors of the bankrupt, and on November 14, 1899, the corporation was adjudged bankrupt by the court below. Daskam thereupon filed his petition against the trustees in bankruptcy, the several

insurance companies, and Roberts, claiming the application of the insurance first, to the payment of his real estate mortgage, and second to the note of $4,106. Roberts claimed the proceeds of the two policies which had been so indorsed, and the loss under which was adjusted at $3,313.34. The trustee answered, denying the right of either Daskam or Roberts. The insurance companies, admitting liability, covered the amount of the loss under the policies into the registry of the court. It was decreed that Daskam was entitled out of the proceeds of the four policies to the amount due upon his note secured by the real estate mortgage, with interest and charges for premiums paid. This decree was accepted by all parties. There remains a balance of $3,560.41, which is the amount here in controversy. After payment to Daskam of his real estate mortgage, there remains of the amount due under the four policies so delivered to the bank a balance of $148.70. The remainder of the fund in the hands of the trustees is derived from the two policies that were delivered to Roberts. The court below decreed that this balance should be paid to Daskam upon the debt represented by the $4,106 note. (D. C.) 108 Fed. 593. From this decree the trustees and Roberts severally appealed.

Frank C. Stewart, for trustees.

James G. Flanders, for R. W. Roberts.

H. W. Mylrea, for Edward Daskam.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts as above). The objection that the oral agreement respecting the insurance was supplanted by the written agreement in the note of May 15, 1899, and had no application to the transaction as finally consummated, cannot be sustained. The total amount of the loan had been received by the bankrupt prior to the giving of the note. The real estate mortgage had been assigned as early as March 1, 1899, having in fact been deposited as collateral prior to that date. At the time of giving the note the loan was consummated pursuant to the oral agreement. The change in the manner in which the agreement was practically carried into effect is immaterial. Equity looks for the substance of things. As contemplated and as carried out, Daskam was surety for the money advanced to the bankrupt,—strictly so as between himself and the bankrupt, although technically as between him and the bank he may have stood as principal. It remains, however, that the loan was made and received under the arrangement that the insurance should stand as security for the indebtedness; and it is quite immaterial, with reference to his right to the insurance fund, whether Daskam gave his own note to the bank, or indorsed the paper of the bankrupt. In either event, as between himself and the bankrupt, he was surety, and entitled as such to all the rights which the oral agreement gave to him or to the bank. Having paid the debt for which he was bound to the bank, he is entitled to be subrogated to all rights and securities held by it.

If, however, it may be held that the oral agreement under which the loan was made must be said to have become merged in the written note of May 15th, the evidence of the oral agreement is not in contradiction, but in explanation, of the note. It is manifest that the note was drawn upon a blank form of note, to be accompanied with deposit of collateral, with power of sale. It, perhaps, was inapt to the purpose, but it is not meaningless. It is at most indefinite.

We gather from the expression, "Fire insurance policies, should fire occur," that certain insurance, in case of loss by fire, was equitably assigned as collateral security, not that fire insurance policies had actually been deposited, for in such case the expression "should loss occur" is without purpose. The evidence of the oral agreement makes clear what otherwise might be doubtful,—the intention of the parties. Such parol evidence is admissible to explain the meaning of indefinite terms. The advances had been wholly obtained under and upon the faith of the parol agreement. The note was given upon the closing up of the matter, and, read in the light of the oral agreement, clearly discloses the intention of the parties. It declares that the insurance, if fire should occur, should stand as security for the payment. We cannot consider this agreement as a common-law pledge, and void because the policies were not given into the possession of Daskam or the bank. It was not a pledge of marketable security or of salable property. Whether we consider the verbal arrangement or the written note, it was an agreement for a beneficial interest in a chose in action,—a personal contract between the insurer and the insured. Under the modern rule, such an equitable interest may be created by parol as well as by deed. The transaction, in equity, amounts to an appropriation of any claim under the policies for any loss by fire which might occur. Nordyke & Marmon Co. v. Gery, 112 Ind. 535, 13 N. E. 683, 2 Am. St. Rep. 219. In Baillie v. Stephenson, 95 Wis. 500, 502, 70 N. W. 660, 661, the court, speaking to the question whether certain transactions amounted to an assignment, said:

"It, in the final analysis, all depends on the intention of the parties. If they intended it to be an assignment of the fund, equity will so treat it. In order to constitute an assignment in equity of a debt or chose in action, no particular form is necessary. Any order, writing, or act which makes an appropriation of the fund amounts to an equitable assignment of the fund. No writing is necessary. It may be by parol as well as by deed. It is sufficient if it amounts to a distinct appropriation of the fund by the debtor, and an agreement that the creditor shall be paid out of it." See also Skobis v. Ferge, 102 Wis. 122, 78 N. W. 426.

It is true that the statement in the note does not indicate the particular insurance; but that is made clear by the evidence, which shows that all the policies were in the keeping of the insurance agent for the parties interested, and that in all of them the loss was made payable to Edward Daskam, mortgagee, and that the clause in the note clearly referred to all the insurance upon the mill covered by these policies. That is also in accord with the letter of January 12th, under which the money was advanced.

Subsequent to this oral agreement and to the note, and a few days before the fire, in July, 1899, the bankrupt caused to be indorsed upon two of the policies, "Loss payable to R. W. Roberts as his interest may appear." Mr. Roberts at that time was a creditor of the bankrupt. The chief officer of the bankrupt intended by this to secure Mr. Roberts, subject to the claim of Daskam and the bank, under the mortgage, and for the $4,000 debt. It is conceded by counsel that the policies so indorsed were not delivered to Roberts until after the fire. This security was for an antecedent debt. Assuming Mr. Roberts to have had no knowledge of the equitable

rights of the bank and of Daskam upon this insurance over and above the amount of the mortgage debt, it still remains that Mr. Roberts parted with nothing upon the faith of this security, and gave no indulgence with respect to the debt upon the faith of the transfer. His equity, therefore, cannot outrank the equitable lien of Daskam and the bank. He simply stands, as respects this insurance, in the shoes of the bankrupt, taking that to which the bankrupt would have been entitled in case of loss after payment of the debts theretofore secured upon this insurance.

It is claimed by the trustees with respect to the claims of both claimants to the fund that they constitute unlawful preferences created within four months of the bankruptcy in favor of parties having reasonable cause to believe the insolvency of the bankrupt. It is only necessary to say with respect to Daskam and the bank, the equitable liens acquired by them respectively date, if bottomed upon the oral agreement, from January, 1899, and, if upon the note, from May 15, 1899,—more than four months before the bankruptcy,—and do not date from the actual delivery of the policies to the bank, after the fire; actual delivery and possession of the policies being not indispensable to the equitable lien. Spring v. Insurance Co., 8 Wheat. 268, 5 L. Ed. 614.

As we are constrained to the conclusion that the claim of Mr. Roberts must be subrogated to the claim of Daskam, it is unnecessary to consider the contention of the trustees with respect to him.

The decree is affirmed.