### ROOT MFG. CO. v. JOHNSON.

(Circuit Court of Appeals, Seventh Circuit.    October 6, 1914.)

No. 2097.

1. BANKRUPTCY ⊂⇒164—"UNLAWFUL PREFERENCES"—TRANSFERS CONSTITUTING.

Payments in discharge of a valid lien, legal or equitable, or payments which do not diminish the estate of the bankrupt, though made within four months before bankruptcy proceedings are instituted, are not "unlawful preferences," within Bankr. Act July 1, 1898, c. 541, § 60, 30 Stat. 562 (Comp. St. 1913, § 9644).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. ⊂⇒164.

For other definitions, see Words and Phrases, Second Series, Unlawful Preference.]

2. BANKRUPTCY ⊂⇒161—UNLAWFUL PREFERENCES—TRANSFERS CONSTITUTING.

A bankrupt contracted with a railroad company to construct buildings, and defendant furnished materials under a contract by which it waived all right to a lien. Not having been paid according to its contract, defendant refused to furnish any more material unless the railroad company would see that it was paid, which that company promised to do, and defendant thereupon continued to furnish materials, and subsequently filed a notice of lien. Disputes having arisen, a contract was made between the contractor, the railway company, and the contractor's sureties, reciting that various liens had been filed, and that it was desired to prevent the costs and expenses of litigation, and providing that the railway company waived all claims against the contractor, that it would pay a specified amount in satisfaction of all claims against it, that the sureties would furnish a further amount, that these amounts would be deposited in the names of the attorneys for the railway company and the sureties as trustees, and used in paying lienable claims, but that no claims except judgments should be paid, unless approved by all of the parties. This agreement was made, and the fund in question deposited, more than four months before the institution of bankruptcy proceedings, but within the four months defendant was paid from the fund a part of its claim in settlement of the claim. *Held* that, assuming that defendant did not have a valid lien, his claim was, nevertheless, one of those for the payment of which the fund was created, especially where it appeared that in the negotiations leading up to the agreement all legitimate claims for labor and material were regarded as lienable claims, and as the fund was entirely segregated from the bankrupt's estate more than four months before the bankruptcy proceedings, the payment to defendant was not an unlawful preference, though the bankrupt approved the claim within the four months, as in doing so he acted merely as a trustee of the fund; the payment having in no way depleted the bankrupt's estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. ⊂⇒161.]

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BANKRUPTCY ⊗⟶161—UNLAWFUL PREFERENCES—TRANSFERS CONSTITUTING.
  Such agreement created an equitable lien on the fund, either in favor of defendant or in favor of the railway company, for its protection against liability on its special promise to pay defendant, the payment of which lien was valid as against the trustees in bankruptcy, though made within the four months.

  [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. ⊗⟶161.]

4. BANKRUPTCY ⊗⟶188—"EQUITABLE LIENS"—CREATION.
  An express executory agreement in writing, whereby specific property or a fund is clearly identified to constitute security for a debt or other obligation, creates an "equitable lien" upon the property or fund, enforceable whether the property is in the hands of the promisor or of third parties not bona fide purchasers for value.

  [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–289, 291–295; Dec. Dig. ⊗⟶188.]

  For other definitions, see Words and Phrases, First and Second Series, Equitable Lien.]

In Error to the District Court of the United States for the District of Indiana; Albert B. Anderson, Judge.

Action by Elwyn R. Johnson, trustee in bankruptcy of the Warren Construction Company, against the Root Manufacturing Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with directions.

Plaintiff in error, the Root Manufacturing Company, seeks to reverse a judgment for $6,658.31, recovered by Johnson, as trustee in bankruptcy of Warren Construction Company, on account of a preferential payment of $6,447.67, with interest thereon. The action was tried before the court on waiver of a jury. The facts as found by the court may be summarized as follows:

The Warren Construction Company (hereinafter called the bankrupt) was adjudicated a bankrupt on August 8, 1912, on a petition in involuntary bankruptcy filed against it July 18, 1912. The bankrupt was insolvent since 1910. The Root Company knew of this condition on and after December, 1911. The payment was made April 10, 1912, as hereinafter described, for a preexisting indebtedness of double the amount, and is a larger percentage than unsecured creditors have received or will receive.

The antecedent facts out of which the payment arose are stated in substance as follows: The Cleveland, Cincinnati, Chicago & St. Louis Railway Company (hereinafter referred to as the Railway Company) and the bankrupt, on May 9, 1910, entered into a written contract whereby the bankrupt undertook to erect certain buildings for the Railway Company, furnishing material and doing work for which the Railway Company was to pay nearly $300,000, upon monthly estimates of the work done, after deducting 15 per cent. thereof for reservations provided. Final payment was to be made within thirty days after completion of the work. This contract contained a provision as follows: "If at any time there shall be evidence of any lien or claim for which, if established, the owners of said premises might become liable and which is chargeable to the contractors, the owners shall have the right to retain out of any payment then due or thereafter to become due an amount sufficient to completely indemnify them against such lien or claim."

. In connection with this contract a bond was executed by the bankrupt and the National Surety Company & Bankers' Surety Company as sureties for the faithful performance thereof.

In 1910 the plaintiff in error entered into written contracts with the bankrupt to furnish certain materials for use in the buildings, aggregating nearly $30,000. The contracts contain the following provision: "The subcontractor hereby, for the consideration hereinafter named, waives and releases all lien

⊗⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

or right of lien now existing or that may hereafter arise for work or labor performed or material furnished under this contract under any lien laws upon said building, the land upon which same is situated, and upon any money or moneys due or to become due from any person or persons to said contractor, and agrees to furnish a good and sufficient waiver of lien on said premises from every person or persons and corporation furnishing labor or material for said premises under the subcontractor."

In the summer of 1911, the plaintiff in error notified the Railway Company that it was not being paid for material delivered under its contracts with the bankrupt and that it would not furnish any more material unless the Railway Company would see that it was paid. The Railway Company gave such assurances and in reliance thereon plaintiff in error continued to furnish materials called for by its contract.

On November 25, 1911, the plaintiff in error filed notices of its intention to hold a lien upon the property of the Railway Company for the amount then due, which notices are in the form provided by the Indiana statute for the purposes of a lien and were filed in the recorder's office as provided by statute.

The plaintiff in error fully completed its contracts and received from the bankrupt part payment therefor, but $12,895.34 thereof remained unpaid on November 18, 1911.

In December, 1911, meetings were held between representatives of the Railway Company, the bankrupt, and the various creditors thereof, including plaintiff in error, for the purpose of settling differences between the parties. At this meeting and as well at a subsequent meeting for like purpose, the surety companies above mentioned were represented and an agreement was entered into January 12, 1912, between the Railway Company, the bankrupt and the two surety companies, which contains recitals and provisions as follows:

"Whereas, a controversy has arisen and exists between the Railway Company and the said Construction Company as to whether said contract has been fully performed and as to certain claims each of said parties respectively has against the other growing out of said contract and matters connected therewith, all of which matters the parties desire to settle and adjust by this agreement; and

"Whereas, there have been filed by various individuals and corporations liens and claims on account of labor and materials furnished on said buildings, on which liens suits have been brought or suits are threatened; and

"Whereas, certain suits in attachment against the Railway Company have been filed seeking to reach amounts alleged to be due the Construction Company; and

"Whereas, the amount of said lienable claims exceeds the amount hereinafter conceded and agreed to be due the Construction Company by the Railway Company, and the Railway Company is asserting its right to recover from the surety companies any amount it may be required to pay on account of lienable claims over and above the amount hereinafter agreed and conceded to be due the Construction Company; and

"Whereas, all the parties hereto desire to provide funds necessary to take care of such of said claims as may be lienable against the property of said Railway Company, to the end that costs and expenses of litigation may be avoided and said claims adjusted:

"Now, therefore, in consideration of the mutual covenants and agreements herein contained to be performed by each of the respective parties hereto, the said parties hereby agree and stipulate as follows:

"(1) The Railway Company hereby agrees to accept from the Construction Company the buildings to be constructed under said contract in their present condition as having been completely constructed according to said contract, except that the work being performed by subcontractors shall be fully completed by such subcontractors or by said Construction Company.

"(2) The Railway Company agrees to cancel any claims it may have against the Construction Company on account of its failure to fully perform said contract, or by reason of any omissions in said contract, or claims in connection with said contract, including demurrage claimed on cars of materials

used in said buildings, and to pay in the manner hereinafter stated the sum of forty-two thousand dollars ($42,000) in full payment, release, and satisfaction of all claims and demands of whatsoever kind or nature against it in favor of said Construction Company, and the said Construction Company hereby agrees to accept the said sum of forty-two thousand dollars ($42,000) to be paid in the manner hereinafter stated, in full payment, release, and satisfaction of all claims of every kind or nature it has or may have against the said Railway Company growing out of or in anywise connected with said contract, and to execute proper receipts and releases for said sum.

"(3) The said sum of forty-two thousand dollars ($42,000), together with the sum of twenty thousand dollars ($20,000), hereby agreed to be furnished by the surety companies, making a total of sixty-two thousand dollars ($62,-000), shall be deposited in the Fletcher-American National Bank of Indianapolis, Indiana, in the names of Romney L. Willson and Frank L. Littleton, as trustees for the parties hereto, the same to be used in paying lienable claims which may have been or may hereafter be filed against the Railway Company growing out of said construction contract. No claims, except judgments, shall be paid out of said fund, except upon the approval of the Railway Company, the surety companies, and the Construction Company. Such claims shall be paid by check bearing the personal signature of each of said trustees. The lienable claims shall include, in addition to the claims proper, such court costs or attorney fees as may be adjudged against said Railway Company in any suit upon any such claims. The surety companies shall bear the burden and expense of litigating any claims asserted to be lienable, and may also defend such attachment suits or assist in their defense. If the above funds shall not be sufficient to pay lienable claims in full, the surety companies shall furnish such additional sums as may be necessary to pay said claims.

"(4) After all lienable claims are paid, the balance, if any, of said fund remaining shall first be paid to the surety companies to reimburse them for the amount contributed by them to said fund, and after reimbursing them in full, the balance, if any, shall be paid to the Construction Company, subject to such attachments as may be filed against said sum."

The payment in controversy of $6,447.67 was made by the trustees out of the $62,000 fund on April 10, 1912, pursuant to a written agreement then made between the plaintiff in error, the bankrupt, the Railway Company, and the surety companies, which reads as follows:

"Whereas, said first party has a claim against the Warren Construction Company for $12,895.34, amount unpaid on work done and material furnished by said first party on certain buildings and shops of said Cleveland, Cincinnati, Chicago & St. Louis Railway Company at Beech Grove, Indiana, by virtue of two written contracts between said first party and said Warren Construction Company, one being dated September 10, 1910, and the other November 9, 1910, and claims a mechanic's lien for said unpaid amount against the real estate of said Railway Company upon which said shops are located and against the right of way of said Railway Company in Marion county, Indiana; and

"Whereas, said Railway Company has in its hands certain money held back by it by virtue of its contract with the Warren Construction Company, whereby said Warren Construction Company agreed to erect said buildings and shops at Beech Grove, Indiana, and which contract provided that said money should be held back by the said Railway Company for the purpose of protecting itself against liens filed by any subcontractor whom said Warren Construction Company might fail to pay:

"Now, therefore, this agreement witnesseth that said first party agrees to accept and said second parties agree to pay in settlement and by way of compromise of said claim the sum of $6,447.67 to be paid from said fund retained by said Railway Company, and in which all of said second parties have an interest, and said first party agrees to assign its claims against said Warren Construction Company to Romney L. Willson, trustee, and to release any and all liens it may have on account of said claim or claims against any of the property of said Railway Company.

"Said first party further agrees that said cash payment shall pay 60 per

cent. of its total claim against said Warren Construction Company and to surrender and cancel the notes of said Warren Construction Company now held by it, heretofore given as evidence of part of this indebtedness in excess of 40 per cent. of its total claim of $12,895.34.

"Said second party further agrees that said Romney L. Willson, trustee, shall assign without recourse the unpaid portion of said claim, to wit, 40 per cent. thereof, back to said first party as soon as the attachment suits now filed in the county of Marion, Indiana, against said fund, in said Railway Company's hands, claimed by said attachment creditors to be due said Warren Construction Company, shall be settled or dismissed."

Frank S. Roby, of Indianapolis, Ind., for plaintiff in error.

C. C. Shirley and W. H. Thompson, both of Indianapolis, Ind., for defendant in error.

Before BAKER, SEAMAN, and MACK, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). [1] The judgment against the plaintiff in error rests entirely on the proposition, that the payment of $6,447.67, accepted by it in settlement of its claim of lien, constitutes a preferential payment obtained from the bankrupt in violation of section 60 of the Bankruptcy Act. It was received by the claimant within four months prior to the proceedings in bankruptcy against the debtor (Warren Construction Company) and with knowledge of the fact of the bankrupt's insolvency, so that the plaintiff in error cannot escape liability therefor to the trustee as adjudged—notwithstanding the undisputed bona fides of the transaction otherwise—if the nature and circumstances of the claim and settlement thus made do not exclude the transaction from the well-defined meaning of the provision referred to. On the other hand, it is unquestionable that the statute does not denounce as preferential all payments so obtained by a creditor within the four-months period; that payment may lawfully be accepted for discharge of a valid lien, either legal or equitable; that payments or benefits obtained in various other transactions, as exemplified in recent decisions (Western Tie & Timber Co. v. Brown, 196 U. S. 502, 25 Sup. Ct. 339, 49 L. Ed. 571; Newport Bank v. Herkimer Bank, 225 U. S. 178, 32 Sup. Ct. 633, 56 L. Ed. 1042; Continental Trust Co. v. Chicago T. & T. Co., 229 U. S. 435, 33 Sup. Ct. 829, 57 L. Ed. 1268), are not within the meaning of the statute; and that a transaction is not an unlawful preference (Id.) unless "the estate of the bankrupt was thereby diminished." While payment of such exceptional claims is preferential in the sense of receiving a benefit not authorized in favor of general creditors (not "of the same class"), it is not an unlawful preference. So the facts in evidence must establish a case clearly within the narrow range of these exceptions to defeat recovery.

[2] In the "special findings of fact" filed below the evidential facts (all undisputed) are set forth at considerable length, and they are epitomized in the foregoing statement, together with copies of the two agreements (of January 12 and April 10, 1912) on which the controversy hinges, mainly, if not entirely. Mention, therefore, of these contract relations and pertinent circumstances will suffice for understanding of the ultimate issue as presented: In 1910 the

Warren Construction Company (bankrupt) entered into a contract with the Cleveland, Cincinnati, Chicago & St. Louis Railway Company to construct buildings and works, at times and prices fixed, aggregating about $300,000; and bonds were executed by National Surety Company and Bankers' Surety Company, as sureties, for performance of the work and covenants. For carrying out this work the contractor sublet various portions to numerous subcontractors; and the plaintiff in error was one of the subcontractors, under' two contracts, amounting to $5,400 and $24,100, respectively, each containing a provision for waiver of liens for the work. During operations under the general contract in 1911, difficulties and delays arose, resulting in dissatisfaction both of the Railway Company and various subcontractors, filing of suits and liens by the latter, and disagreement between the Railway Company and its contractor over liabilities. The plaintiff in error had notified the Railway Company of nonpayment by the contractor for work performed under its subcontract, and completed its work under promises on the part of the Railway Company "to see that it was paid." On November 25, 1911, the plaintiff in error had completed its subcontract, and $12,895.34 thereof was unpaid and undisputed; and it then filed and recorded its claim for a mechanic's lien against the property of the Railway Company in conformity with the Indiana statute. In December, 1911, meetings were held attended by representatives of the Railway Company, the bankrupt, and both surety companies, and by various subcontractors, inclusive of the plaintiff in error, for settlement of differences between the parties, resulting in an undisputed written agreement, dated January 12, 1912, and executed by (a) the Railway Company, (b) the bankrupt, and (c) both surety companies. This agreement was completed and the entire fund thereby provided for payment of claims was deposited more than six months prior to the commencement of bankruptcy proceedings. Settlement of the claim of plaintiff in error for payment out of such funds was concluded April 10, 1912, under the further agreement of that date, signed by all parties to the agreement of January 12, together with the plaintiff in error, and it thus falls within the inhibited four-months period, if the statute is applicable to such payment.

One of the contentions for reversal is that the plaintiff in error had a valid and enforceable mechanic's lien for this unpaid claim, notwithstanding its so-called waiver thereof, and much of the argument on this appeal is directed for and against the dual propositions on which it rests, namely: (a) That the stipulation of waiver is not an independent one, but dependent on the ensuing stipulation for final payment to be made "within forty days after the contract is fulfilled"; and (b) that such waiver in an executory contract of the lien provided by the Indiana statute "is contrary to public policy and void." We have not been impressed with either of these theories as tenable, either on the oral argument or upon examination of the authorities cited in the briefs, and they appear to be met and overruled by 'a decision of the Appellate Court of Indiana (since the hearing of this appeal, called to attention by supplemental brief) in the suit of Carson-Payson Co. v. C., C., C. & St. L. Ry. Co.—for enforcement of

the statutory lien by one of the above-mentioned subcontractors, under an analogous stipulation of waiver—reported 105 N. E. 503. Proceeding, therefore, on the assumption that the lien filed by the plaintiff in error on November 25, 1911, was not enforceable at law, in a suit founded alone on the contract for the work, the issue is limited to the force and effect of the above-mentioned agreement of January 12th and the segregation of fund thereby provided to entitle the plaintiff in error to receive payment of its claim thereunder, irrespective of bankruptcy proceedings against the debtor.

The agreement thus relied upon (in connection with the undisputed facts in reference to the claim) to render the payment lawful is entirely free from doubt as to its bona fides and purposes. It plainly provides a fund which was completely segregated from the estate of the bankrupt so long as any claim within its purview remained unsettled. It is free from ambiguity in any of its terms, except as to the meaning with which the term "lienable claims" was used therein. It was executed by both parties to the primary contract for the work and by both sureties for its performance by the contractor (bankrupt), and it expressly recites: An existing controversy between the Railway Company and the contractor in reference to performance and liabilities thereunder, to be adjusted; that various liens had been filed by parties who had furnished labor and materials, wherein suits were threatened and attachments had been brought to reach amounts due from the Railway Company; that "the amount of said lienable claims exceeds the amount hereinafter conceded" to be due the contractor, and the Railway Company asserts claim against the sureties for any amount it is required "to pay on account of lienable claims" in excess thereof; and that all parties "desire to provide funds necessary to take care of such claims as may be lienable against the property" of the Railway Company "to the end that costs and expenses of litigation may be avoided and said claims adjusted." The contract then provides, in substance: (1) The Railway Company accepts the buildings in their present condition "as having been completely constructed according to said contract, except that work being performed by subcontractors shall be fully completed." (2) The Railway Company cancels its several claims (as mentioned) for breach of the contract; and it agrees to pay and the Construction Company agrees to accept $42,000 in satisfaction of all claims thereunder. (3) This payment, together with $20,000 furnished by the surety companies, making $62,000, is to be deposited in a bank (specified) "in the names of" Willson and Littleton "as trustees for the parties hereto," and "used in paying lienable claims" which have been or may be filed against the Railway Company, but "no claims, except judgments, shall be paid out of said fund, except upon approval of the Railway Company, the surety companies, and the Construction Company"; and "lienable claims" shall include all costs adjudged against the Railway Company in suits, and the surety companies "shall bear the burden and expense of litigating any claims asserted to be lienable" and shall furnish any additional sums if the above fund proves insufficient. (4) If any balance of the fund remains "after all lienable claims are paid," the Surety Companies are to be reimbursed therefrom for their contribu-

tions, and any remainder is "to be paid to the Construction Company." Succeeding provisions do not bear upon the present inquiry, except that one (8) may be mentioned as requiring the "trustees" to "render each of the parties hereto an itemized statement showing the disposition of such trust fund," and to serve "without compensation other than such as may be paid them by the parties they respectively represent." The evidence shows that Littleton represented the Railway Company, and Willson the surety companies, as their respective attorneys in the settlement.

We are of opinion that these recitals and provisions clearly establish the purposes of the fund thereby created to be: First, to protect the Railway Company, in consideration of its paying in $42,000 (when it was questionable whether even half that sum was due the contractor), against all lien claims (then estimated in excess of $60,000) and litigation thereof, so that it was to be free from further liability; second, to protect the surety companies from their ultimate liability for the expenses and delay of litigation over the claims, in consideration of their contribution to the fund, by providing (in lieu of a judgment) for their settlement out of the fund on joint approval of the parties; third, to assure the lien claimants (who participated in the negotiations, but are mentioned only as a class), as the ultimate beneficiaries, of such dedication of the fund so set apart for settlement of their claims without litigation, on approval thereof. The bona fide provisions and purposes so described, not only constitute an equitable arrangement for all interests therein, but, thus made more than four months prior to the bankruptcy proceedings, are immune from the statute. Its purpose to provide for settlement of "liens and claims on account of labor and materials furnished on said buildings" for which lien claims had been filed is expressly mentioned, so that it is not open to question, as we believe, that the plaintiff in error, having long theretofore filed his lien claim, is clearly identified as a beneficiary for settlement out of the fund whenever his claim is either adjudicated or approved by the parties; and this view arises irrespective of the equities presented both in its favor and in favor of the Railway Company, under the facts (stated in the findings) of its completion of the work after payment therefor had been assured on behalf of the Railway Company. Furthermore, the contention in support of the judgment, that the term "lienable claims," as used in the agreement, is to be construed as excluding any claim not legally enforceable as a lien against the property, impresses us to be inconsistent, both with the provisions as an entirety and with the undisputed testimony as to the negotiations leading up to the agreement that the parties "considered all claims" lienable "which were legitimate claims for labor and material"; and no discussion or suggestion arose whether any of the numerous claims represented at the meetings were or were not enforceable as valid liens. Indeed, the agreement to avoid litigation and substitute approval by the parties in lieu of adjudication is strongly persuasive that all just claims for labor and materials were embraced in the provision.

The fund of $62,000 thus provided must be treated as an entirety for carrying out its purposes. While it refers to Willson and Little-

ton as trustees thereunder, they are in truth mere custodians of the fund, without discretion or authority to pay any claims not in judgment, unless approved by all of the contracting parties. It is plainly made a trust fund, entirely segregated from the estate of the bankrupt, which requires complete administration by the parties to perform its purposes. In effect, therefore, the parties have charged themselves with that power and duty, through the requirement that they shall severally ascertain and approve the claims to be paid. Thus performance of that function becomes the act of each as representative or trustee of the trust fund and not on his personal behalf, so that the mere fact that the bankrupt joined with his cotrustees in approval (within the four months period) of the subsequent settlement of the claim in suit, is without force to invalidate the settlement. This distinction of duality, between the action of one in his capacity as trustee or representative of a fund and his action merely personal (as bankrupt), is aptly pointed out in Clarke v. Rogers, 228 U. S. 534, 544, 33 Sup. Ct. 587, 57 L. Ed. 953, and cases cited. The settlement so made, within the terms of the contract and in good faith, for payment out of the trust fund, binds all parties and we do not understand that payment thereupon is open to question on the part of the trustee in bankruptcy. In that aspect of the case, the payment in suit is exclusively attributable to this fund, so that the payment not only caused no depletion of the bankrupt's estate, but tended in fact to augment it to the extent of the reduction of 50 per cent. exacted for the settlement; and the assignment of error for that cause may rightly be sustained on the pertinent authority of Continental Trust Co. v. Chicago T. & T. Co., supra, and cases cited. The above-mentioned clause as to disposition of any remainder of the fund after payment of all claims—that the surety companies are to be reimbursed for their contribution and if any balance remain it is to be paid to the bankrupt—although evidently inserted as a formality in reference to the bankrupt when the claims appeared to be in excess of $60,000, plainly entitles the estate to be paid any balance which so remains out of the sums paid in by the Railway Company. The evidence shows: That all claims have been settled and paid except one, which is in litigation in the state courts; that most (if not all) of them were settled at considerable discounts, making an aggregate of about $35,000 disbursed, and that, laying aside the $20,000 (unused) contributed by the surety companies, $7,572.12 remains in the fund unexpended; that the outstanding claim (in litigation) is that of Carson Payson Company of $16,202.95, for which the claimant elected to proceed for enforcement of an alleged mechanic's lien, instead of accepting settlement out of the fund—presumably the above-mentioned case wherein such enforcement has been denied on appeal from like denial below.

[3] We are of opinion, however, that the judgment is likewise erroneous upon another ground (not called to attention in the arguments), based on the effect of the agreement of January 12th, in connection with the findings of fact proving the equities of the claim presented by the plaintiff in error. Its subcontract contained a clause which made it questionable, to say the least, whether performance of

the work would entitle it to the security of a mechanic's lien for payment; and when the difficulties arose on the part of the contractor for meeting payments, the plaintiff in error refused to proceed with its work until expressly assured by the Railway Company that its claim would be provided for. Relying on such promise, the work was carried on and completed, and the lien claim was duly filed, evidently as a precautionary measure to preserve all rights. The plaintiff in error participated in the December meetings to arrange for settlement of the claims, was advised of the ensuing agreement and its provisions therefor, and rested in reliance upon it for payment of its claim without suit. We understand the agreement thus concluded to create an equitable lien upon the entire fund, enforceable alike, either for protection of the Railway Company under its special promise referred to, or in favor of the plaintiff in error as a beneficiary thereof—identified as such by the express reference above mentioned to lien claims filed, if not otherwise sufficiently identified as of the class referred to as having "lienable claims"—clearly within the well-settled definition of equitable liens, which are uniformly upheld when good faith appears, both as against a holder who is not a purchaser for value and against trustees in bankruptcy. Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865; Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995; Van Iderstine v. Nat. Discount Co., 227 U. S. 575, 33 Sup. Ct. 343, 57 L. Ed. 652; Greey v. Dockendorff, 231 U. S. 513, 34 Sup. Ct. 166, 58 L. Ed. 339; and by this court in McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554.

[4] This doctrine of equitable liens is fundamental in equity whenever the intention, bona fides, identity, and segregation appear, without perfection as a common-law pledge by actual possession in the pledgee; and Walker v. Brown, supra, is an instructive case for its definition and application. It defines the rule to be (in substance) that an express executory agreement in writing, whereby specific property or a fund is clearly identified to constitute security for a debt or other obligation, creates an equitable lien upon the property or fund, enforceable whether the property is in the hands of the promisor, or of third parties not bona fide purchasers for value; and it approves the rule under these circumstances: Brown had delivered to Lloyd Mercantile Company, for assisting its credit, municipal bonds amounting to $15,000, which remained so placed after reorganization of the company, when the new company requested a line of credit with Walker & Co., on the strength of such holding, for large purchases of goods. Such credit was not extended, however, until after Brown had agreed in writing, that the bonds should so remain in the hands of the debtor "as long as there remained any debt due to Walker & Co." Subsequently, without the creditor's knowledge, Brown obtained return of the bonds to him, when the debtor was in truth insolvent and indebted to Walker & Co. in a large amount; and later Brown transferred the bonds to his wife as a gift. An equitable lien was upheld making the bonds chargeable as security for the indebtedness to Walker & Co.

In the recent case of Sexton v. Kessler, supra, the ruling in support of an equitable lien is even more notable in the circumstances of the debtor's possession of the securities. It arose in a suit by the trustee in bankruptcy to set aside the bankrupt's transfer of securities to a creditor, made within less than a month of bankruptcy proceedings and with knowledge on the part of the creditor of the insolvency. The bankrupt was a New York firm and the creditor an English corporation, and they had long been engaged in a course of business, whereby the latter made advances to the former under a so-called "drawing credit." As security for the advances, it was the express agreement and constant practice for the New York firm to set aside negotiable securities, purchased in their own business, which were placed in a package "upon a separate shelf of the New York firm's vault," and marked as "Escrow for Account" of the English Company, "intended as a protection against our long drawings against your good selves"; and during recent years the agreement and practice included periodical certificates made by the debtor and sent to the creditor, naming the securities so held by the former. The agreement further provided that the New York firm were at liberty to withdraw any of the securities so held "and replace them by others of equal value," and such changes were frequently made by the New York firm throughout the course of their dealings, which were continuous for several years, up to the moment when the New York firm became insolvent and so notified a representative of the English corporation. The package of securities then held as above described were immediately delivered to such representative. While the good faith of the transactions was challenged by the trustee in bankruptcy, the opinion overrules both that objection and the contention of unlawful preference, and rules (in effect) that the arrangement conferred and preserved an equitable lien upon the securities so held and transferred, so that their surrender was not preferential.

In Van Iderstine v. Nat. Discount Co., supra, and Greey v. Dockendorff, supra, assignments of book accounts as security for advances are upheld as conferring equitable liens, good faith appearing; and the objection raised "that this lien was secret" is overruled as without force. In McDonald v. Daskam, supra, an equitable lien is recognized and enforced in favor of a creditor and against a trustee in bankruptcy, through notations on fire insurance policies left in the hands of the insurer's agent.

We believe the findings of fact clearly authorize our above stated conclusions of law, and thus establish the right of the plaintiff in error to retain the payment made to it out of the fund described.

The judgment is therefore reversed, and the cause remanded to the District Court, with direction to enter judgment thereupon in favor of the defendant below.